Kent L. BROWN and Larry R. Hendricks, Plaintiffs and Appellants,

v.

Roy B. MOORE, Elaine B. Weis, Department of Financial Institutions of Utah, and Does 1 through 20, Defendants and Appellees.

No. 970394

Supreme Court of Utah.

Dec. 11, 1998.

John K. Mangum, Scott M. Ellsworth, Salt Lake City, for plaintiffs.

Ray R. Christensen, Salt Lake City, for defendants.

DURHAM, Associate Chief Justice:

Kent L. Brown and Larry R. Hendricks (collectively plaintiffs) appeal from the district court's grant of summary judgment in favor of the only remaining defendant in this case, the Department of Financial Institutions (DFI), and from the district court's denial of plaintiffs' motion for partial summary judgment on their breach of contract claim. The district court held that, as a matter of law, DFI had not breached the implied covenant of good faith and fair dealing in its contract with plaintiffs when it took possession of a savings and loan institution they owned.

In November of 1984, plaintiffs became interested in purchasing Western Heritage Thrift and Loan (Western Heritage) after receiving a call from Jim Munsee, then president of Western Heritage. Munsee told plaintiffs that Western Heritage was a "gold mine," "a once in a lifetime opportunity," and a "sound investment." At that time, Western Heritage was a "failing depository institution" under Utah Code Ann. § 7–19–1(1) and was losing approximately $30,000 per month. Plaintiffs met with Munsee to discuss the possibility of buying Western Heritage. Immediately after the Munsee discussion, Hendricks went to Western Heritage's office to inspect the company records. On November 13, 1984, after the meeting with Munsee had kindled plaintiffs' interest, plaintiff Hendricks met with employees of Main Hurdman, Western Heritage's accounting firm. Hendricks examined an unsigned preliminary financial report for Western Heritage for the fiscal year ending June 30, 1984. A Main Hurdman employee orally verified the accuracy of the report.

After consulting with Main Hurdman, Hendricks met with Roy Moore, attorney for Western Heritage. Moore and Hendricks discussed Moore's efforts to collect delinquent debts owed to Western Heritage. Moore "painted a glowing picture of Western Heritage's prospects and potential for recovery in such litigation." Hendricks knew that Moore would have to file lawsuits against the debtors in order to collect the amounts owed, but made no independent investigation of the debtors or their ability to repay and did not examine existing files regarding any of the cases.

In addition to discussing attempts to recover the bad debts, Moore and Hendricks discussed real estate owned by Western Heritage. The portfolio of other real estate consisted of property pledged as security for delinquent loans which Western Heritage had acquired through foreclosures. Moore represented that the real estate was "100% collectible," meaning that the properties could be sold for an amount equal to the bad debts. Hendricks did not undertake an independent evaluation of the real estate's value.

In contrast to the extensive meetings plaintiffs had with representatives of Western Heritage, plaintiffs had relatively few contacts with DFI during that same time period. Plaintiff Hendricks met DFI Commissioner Elaine Weis only twice and could not recall any conversations with her. In fact, plaintiffs recall the contents of only one conversation with DFI representatives: a conversation with Ed Leary in which they discussed the plaintiffs' revised plan to purchase Western Heritage.

During the course of negotiations, plaintiffs learned that any offer they made to purchase Western Heritage would not be acceptable to DFI without written month-by-month projections of Western Heritage's financial status extending at least three years forward from the date of purchase. Plaintiffs prepared and submitted to DFI these financial projections, or pro formas, detailing Western Heritage's financial future. The pro formas plaintiffs submitted to DFI indicated that Western Heritage would continue to lose money each month until December 1986, although at a steadily decreasing rate. However, after December 1986, the projections showed Western Heritage would begin to make money and plaintiffs would recoup their investment by the end of the sixth year of their operation of the company. Thereafter, plaintiffs expected that Western Heritage would make a profit of approximately $25,000 per month.

After reviewing Western Heritage's income and loss statement for November 1984, however, plaintiffs concluded that the purchase plan they had submitted to DFI was not feasible, and they informed DFI that they could not go forward with the deal. Plaintiffs then received a telephone call from Ed Leary of DFI encouraging them to revise their pro formas and resubmit their purchase offer.

Plaintiffs revised the pro formas and agreed to infuse Western Heritage with $550,000 as new capital. All parties involved knew that, even with the additional capital, Western Heritage still would not have sufficient capital to meet the minimum requirements under Utah law. DFI told plaintiffs that the necessary additional capital could be supplied by the Utah Industrial Loan Guaranty Corporation's (ILGC) purchase of $2,000,000 of "net worth certificates" from Western Heritage, which DFI would recognize as cash equivalents for accounting purposes in meeting capitalization requirements. By use of this device, plaintiffs could purchase and operate Western Heritage, and closure and liquidation would be avoided.

On December 26, 1984, plaintiffs entered into an agreement with DFI in which plaintiffs agreed to purchase all of the stock of Western Heritage. At the same time, plaintiffs also entered into a separate agreement with ILGC, requiring ILGC to purchase a net worth certificate from Western Heritage in the amount of $1,000,000, to purchase a second net worth certificate in the amount of $250,000 after plaintiffs infused an additional $150,000 into Western Heritage, to purchase a third net worth certificate in the amount of $250,000 conditioned on Western Heritage improving its net worth as set forth in the pro formas, and finally, to purchase a fourth net worth certificate in the amount of $500,000 on or before January 1, 1986, if Western Heritage continued to improve its net worth in accordance with the pro formas.

Plaintiffs paid the required capital into Western Heritage. In March and April of 1985, plaintiffs received an updated audit of Western Heritage. The audit disclosed that the appropriate reserve for bad debts and anticipated losses should have been well in excess of the amount originally represented by DFI and others associated with the transaction. From April to December 1985, plaintiffs further discovered that DFI and Western Heritage representatives had overstated Western Heritage's assets during purchase negotiations. Despite the bleaker than anticipated financial picture, plaintiffs operated Western Heritage with losses less than projected in the pro formas. Beginning in January 1986, eleven months ahead of schedule, Western Heritage began to show a profit.

On May 2, 1986, plaintiffs met with then Governor Norman Bangerter and the Commissioner of DFI, Elaine Weis. At this meeting, the Commissioner informed plaintiffs and representatives from other savings and loan institutions that the ILGC was insolvent and that the State intended to take it over. The Commissioner further informed the representatives that they should continue to maintain the appearance of business as usual, although they should refuse any new loan applications until the State actually seized the ILGC.

On June 2, 1986, the Commissioner informed plaintiffs that she intended to close Western Heritage and six other thrifts. The Commissioner recommended that plaintiffs restructure Western Heritage in an attempt

to avoid State seizure. Following the Commissioner's advice, plaintiffs formulated a reorganization plan for Western Heritage which would have required the partial conversion of depositors' funds into equity. Plaintiffs believed that their reorganization plan would save Western Heritage from State seizure and allow it to qualify for membership in the Federal Deposit Insurance Company (FDIC). At the end of June, plaintiffs presented their plan to the FDIC. The FDIC rejected the reorganization plan.

In July 1986, DFI took possession of the insolvent ILGC. As a result of DFI's seizure of the ILGC, Western Heritage was no longer allowed to use the net worth certificates in calculating its capital operating amounts for purposes of State law, and became a failing depository institution. At that time, DFI also issued an order prohibiting Western Heritage and other similarly situated thrifts from making payments to creditors and limited the amount that depositors with regular savings accounts could withdraw. Plaintiffs attempted to find a buyer for Western Heritage, but were unsuccessful.

On September 22, 1986, the district court authorized DFI to take possession of Western Heritage. On September 23, Western Heritage received a "Notice of Filing of Petition and Need to File Objections Thereto Within Ten Days." Almost one month later, plaintiff Brown filed a petition for judicial review of DFI's seizure of Western Heritage in the district court. After a lapse of almost two years, in September 1988, the district court dismissed Brown's petition as untimely because it was not filed within the ten-day period required by Utah Code Ann. § 7–2–3(1) (Supp.1986). More than a year prior to the dismissal of Brown's petition, on April 23, 1987, the district court approved the liquidation of Western Heritage. Subsequent to liquidation, plaintiffs filed the complaint that forms the basis of this action.

In January 1991, the defendants filed a motion for summary judgment which the district court granted. Plaintiffs appealed, arguing that the district court erroneously awarded summary judgment to defendants on the following issues: (1) breach of express and implied contractual obligations; (2) violation of plaintiffs' substantive due process rights by violating the takings clause of the Utah Constitution; (3) violation of plaintiffs' procedural due process rights by depriving them of a hearing prior to DFI's seizure of Western Heritage; and (4) violation of 42 U.S.C. § 1983 by depriving plaintiffs of their right to due process. *Brown v. Weis*, 871 P.2d 552, 558 (Utah Ct.App.1994) (*Brown I*).

The court of appeals upheld the trial court in every respect except one; it remanded on the sole issue of whether defendant DFI breached the implied covenant of good faith and fair dealing by "wrongfully subvert[ing] plaintiffs' opportunity to realize the benefit of their bargain." *Id.* at 565. According to the court of appeals, the only remaining issue was whether, under the circumstances, it could be fairly inferred that DFI was required to allow plaintiffs to operate Western Heritage for a period sufficient to allow them to recoup their investment. *Id.* at 563.

On remand, after extensive discovery, the only remaining defendant, DFI, again moved for summary judgment, arguing that it had not breached the covenant of good faith and fair dealing because its sole obligation under the contract with plaintiffs was to approve the transfer of ownership of Western Heritage to plaintiffs. Plaintiffs filed a cross motion for partial summary judgment on the issue of DFI's liability for breach of the covenant of good faith and fair dealing. The district court granted DFI's motion and plaintiffs filed this appeal.

■ Summary judgment is appropriate only where there are no disputed material facts and the moving party is entitled to judgment as a matter of law. Utah R. Civ. P. 56(c); *DOIT, Inc. v. Touche, Ross & Co.*, 926 P.2d 835, 841 (Utah 1996). We review the district court's grant of summary judgment for correctness, according no deference to that court's legal conclusions. *Id.*

Plaintiffs claim that DFI breached the implied covenant of good faith and fair dealing by taking possession of Western Heritage before the lapse of a period sufficient to permit them to recover their investment. Plaintiffs assert that so long as they complied with the pro formas submitted with their

offer to purchase Western Heritage, DFI was obligated to continue crediting the ILGC net worth certificates toward the capital requirements imposed by State law. DFI counters by arguing that it performed its only contractual obligation when it entered the findings and conclusions permitting plaintiffs to purchase Western Heritage. DFI emphasizes that plaintiffs cannot identify any representation or promise on the part of DFI which would support a finding of breach of the covenant of good faith and fair dealing, noting the limited contacts plaintiffs had with DFI representatives prior to executing the purchase agreement.

■■ As a general rule, "every contract is subject to an implied covenant of good faith." *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991); *Berubé v. Fashion Centre, Ltd.*, 771 P.2d 1033, 1046 (Utah 1989); *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 798 (Utah 1985). "Under the covenant of good faith and fair dealing, each party impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract." *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 199 (Utah 1991). A violation of the covenant of good faith and fair dealing gives rise to a claim for breach of contract. *Id.* at 200; *Beck*, 701 P.2d at 798. The State, having waived immunity for contractual obligations, may be held liable for a breach of that covenant. *See* Utah Code Ann. § 63–30–5(1) (1997); *Brown I*, 871 P.2d at 563–64.

■■ In determining whether a party has breached the covenant of good faith and fair dealing, we are not limited to an examination of the express contractual provisions; we will also consider the course of dealings between the parties. *St. Benedict's*, 811 P.2d at 200 (citing S. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv. L.Rev. 369, 371 (1980)); *Andalex Resources, Inc. v. Myers*, 871 P.2d 1041, 1047–48 (Utah Ct.App.1994) (examining contract language and course of dealings to determine whether breach of covenant of good faith occurred). However, we will not interpret the implied covenant of good faith and fair dealing to make a better contract for the parties than they made for themselves. *Rio Algom Corp. v. Jimco Ltd.*, 618 P.2d 497, 505 (Utah 1980) (citing *J.R. Simplot Co. v. Chambers*, 82 Idaho 104, 350 P.2d 211 (1960)). Nor will we construe the covenant "to establish new, independent rights or duties not agreed upon by the parties." *Brehany*, 812 P.2d at 55.

■■ In this case, an examination of the contract language reveals no express obligation on the part of DFI to allow plaintiffs to operate Western Heritage for a sufficient period to recoup their investment. Nor is there any language which guarantees that DFI will continue to count the net worth certificates toward capital requirements for any specific amount of time. DFI's only express contractual obligation was "to enter appropriate and sufficient Findings and Conclusions in support of an Order pursuant to Section 7–2–1(2)(a) and to enter such Order requiring the Thrift and the Holding Company to immediately convey to [plaintiffs] all of the stock of the Thrift." It is undisputed that DFI complied with this express contractual obligation. Thus, if plaintiffs are to defeat summary judgment, the course of dealings between the parties must disclose some other obligation, express or implied, on the part of DFI which could give rise to a breach of the covenant of good faith and fair dealing.

Plaintiffs argue that the covenant of good faith and fair dealing required DFI to continue to recognize the net worth certificates as capital investment regardless of the financial condition of the ILGC. In essence, plaintiffs argue that DFI assumed the risk of the ILGC's insolvency. The undisputed evidence, however, does not support plaintiffs' claim. First, plaintiffs can show no express representation on the part of DFI that it would continue to recognize the net worth certificates regardless of the ILGC's solvency. Plaintiffs recall only a few meetings with DFI representatives prior to purchasing Western Heritage and remember few, if any, details of those meetings. None of those details suggests that DFI represented that plaintiffs could continue operation of Western Heritage in the event of the ILGC's insolven-

cy. The record does not indicate that the subject ever came up.

■ Second, an opinion letter drafted by the ILGC and issued in conjunction with the execution of the agreement between the ILGC and plaintiffs states that "no opinion is expressed with respect to whether there are or will in the future be sufficient assets to enable the ILGC to perform the obligations incurred in connection with this transaction or other transactions past, present or future." The letter establishes that the transaction was devoid of representations regarding the current or future financial stability of the ILGC, and of any intentions by the DFI to assume the risk of the ILGC's potential insolvency. It should have indicated to plaintiffs that if the ILGC could not perform as promised, additional capital infusions on plaintiffs' part would be necessary to keep Western Heritage afloat.

■ Third, plaintiffs, as sophisticated businessmen purchasing a financial institution, must be charged with notice of the law governing the ILGC. *See Prows v. State*, 822 P.2d 764, 769 (Utah 1991) (holding thrift owners chargeable with notice of statutes limiting ILGC liability). At the time plaintiffs purchased Western Heritage, section 7–8a–20(2) specifically provided that the ILGC "is not an instrumentality of the state of Utah or the Federal Government." Utah Code Ann. § 7–8a–20(2) (Supp.1983). Thus, any assumption by plaintiffs that the State had an obligation to stand behind the ILGC was not reasonable.

Because no express or implied obligations of or representations by DFI indicated that DFI would recognize the net worth certificates regardless of the ILGC's financial condition, DFI's eventual decision to discontinue doing so cannot form the basis of a breach of the covenant of good faith and fair dealing. A contrary holding would "establish new, independent rights or duties not agreed upon by the parties." *Brehany*, 812 P.2d at 55.

Plaintiffs rely heavily on *United States v. Winstar*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), in which the United States Supreme Court held that the federal government breached its contractual obligation to recognize goodwill and capital credits in computing regulatory capital reserves for savings and loan institutions that underwent supervisory mergers. *Winstar*, 116 S.Ct. at 2440. The facts in *Winstar* are, in some respects, quite similar to the case at bar, but the contracts in question are quite different. During the savings and loan crisis in the 1980's, the Federal Home Loan Bank Board encouraged healthy thrifts and outside investors to take over failing thrifts in supervised mergers. *Id.* at 2442. As an inducement, the Bank Board specifically promised the buyers that they could count supervisory goodwill and capital credits toward the capital reserve requirements legally necessary for operating the thrifts. *Id.* at 2443–44. A subsequent legislative change forbade the buyers from counting supervisory goodwill or capital credits toward the reserve requirements; the change resulted in the seizure of the newly purchased thrifts. *Id.* at 2446–47. The buyers, arguing that the Bank Board had breached its promise to count supervisory goodwill and capital credits toward reserve requirements, brought breach of contract claims against the United States. *Id.* at 2447. The Court held that the government expressly assumed the risk of a subsequent change in the regulatory capital requirements and, thus, was liable for damages the buyers incurred when the legislative change forced the government to seize the failing institutions. *Winstar*, 116 S.Ct. at 2440.

*Winstar* is distinguishable from this case. As set forth above, unlike the *Winstar* plaintiffs, plaintiffs cannot point to any express contractual obligation on the part of DFI to continue to count the net worth certificates toward operating capital requirements regardless of the ILGC's financial condition, or to any representation from which we could conclude that DFI assumed the risk of the ILGC's insolvency.

We sympathize with plaintiffs' plight. They attempted to salvage a failing depository institution by investing significant capital and personal effort. They may have saved the State money by continuing the operation of Western Heritage for a year and a half after its initial failure. On the other hand, plaintiffs rushed into the transaction; they completed the purchase of a financial institu-

tion in less than two months without the assistance of an attorney. They failed to conduct a reasonable investigation into the financial stability of the ILGC or of Western Heritage itself. Plaintiffs relied on misleading financial statements provided by the then owners of Western Heritage. For example, they failed to discover that the real estate acquired by Western Heritage as a result of foreclosure was being carried on the corporate books in an amount in excess of its actual value. This oversight necessitated an unanticipated increase in the allowance for losses. Plaintiffs also neglected to conduct an adequate investigation into the status of Western Heritage's pending attempts to collect bad debts. Plaintiffs read the office files of the attorney representing Western Heritage and relied on his representation that the bad debts were owed by solvent entities and that he could recover all the amounts owed. Plaintiffs did not conduct an independent investigation into the status of the litigation, examine court files, or inquire about the financial condition of any of the debtors being sued. In sum, plaintiffs appear to have been misled by agents of Western Heritage into buying a failing thrift; they must now bear the burden of their hasty decision.

We hold that DFI did not have an express contractual obligation to continue to recognize net worth certificates for purposes of Western Heritage's compliance with capital requirements regardless of the financial condition of the ILGC. We further hold that the course of dealings between DFI and Western Heritage does not reveal any obligation of, or representations by, DFI which would support a breach of the implied covenant of good faith and fair dealing. The district court's grant of summary judgment in favor of DFI is, therefore, affirmed.

Chief Justice HOWE, Justice ZIMMERMAN, Justice RUSSON, and Judge GREENWOOD concur in Associate Chief Justice DURHAM's opinion.

Justice STEWART does not participate herein; Judge GREENWOOD sat.