**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 15 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENH CIRCUIT

---

SANPETE WATER CONSERVANCY DISTRICT,

    Plaintiff-Appellant,

v.

CARBON WATER CONSERVANCY DISTRICT;
PRICE RIVER WATER USERS ASSOCIATION;
UNITED STATES BUREAU OF RECLAMATION,

    Defendants-Appellees.

No. 99-4136

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 96-CV-975)**

---

Charles P. Sampson (Claudia F. Berry of Suitter Axland; John W. Anderson and
John S. Flitton of Pruitt, Gushee & Bachtell with him on the briefs) of Suitter
Axland, Salt Lake City, Utah, for Plaintiff-Appellant.

James B. Lee (James E. Karkut with him on the brief) of Parsons Behle &
Latimer, Salt Lake City, Utah, for Defendant-Appellee Carbon Water
Conservancy District.

---

Before **BRORBY, HOLLOWAY** and **BRISCOE**, Circuit Judges.

---

**BRORBY**, Circuit Judge.

---

This case flows from yet another skirmish in the never-ending war over water in the American West. Sanpete Water Conservancy District (Sanpete) and Carbon Water Conservancy District (Carbon) are the long-time combatants, and frequent litigants, in this battle concerning the capture and use of water in the Price River watershed in Utah. This most recent lawsuit is a contract interpretation case. The district court granted partial summary judgment to Carbon on Sanpete's breach of contract claim and, after a four-day bench trial, entered judgment against Sanpete on its claim of breach of the implied covenant of good faith and fair dealing. Sanpete appeals. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.[1]

## BACKGROUND

The basic, background facts are taken largely from the district court's June 3, 1999 Findings of Fact and Conclusions of Law, because they are not in dispute. We also consult previous court cases involving the parties for historical perspective.

---

[1] Sanpete filed an amended complaint in state court, naming the United States Bureau of Reclamation (Reclamation) as a defendant. The district court gained jurisdiction when Reclamation filed its notice of removal pursuant to 28 U.S.C. §§ 1442 and 1446.

This case involves a disagreement over the scope of a contract involving Sanpete, Carbon, and the Price River Water Users Association (Price).[2] The parties entered the contract to resolve a decades-old conflict concerning "the priority and use of water rights owned by Price and Sanpete for water from the Price River." "Utah is a prior appropriation state, where the appropriator first in time is first in right." *Salt Lake City v. Silver Fork Pipeline Corp.*, 5 P.3d 1206, 2000 WL 10242, at *8 (Utah Jan. 7, 2000) (citing Utah Code Ann. § 73-3-1). Therefore, as the district court pointed out, the priority of one's water right becomes very important in times of shortage because the "senior appropriator is guaranteed the full measure of his or her appropriation before any claim by a junior appropriator may be satisfied." *Id*. The Utah Supreme Court has described the origins of the current dispute:

> In 1933, [Reclamation] prepared a water storage plan known as the Gooseberry Project, which called for the creation of a reservoir on Gooseberry Creek, a tributary of the Price River, and for diversion of Gooseberry Creek water through a transmountain tunnel into the Sanpete County area. At that time, Price River Water Conservancy District ... held water rights in Gooseberry Creek,[3] storing this water in the privately owned Scofield Reservoir several miles downstream from the proposed diversion point.

---

[2] The district court dismissed Price from the current lawsuit pursuant to a stipulation of the parties, but Price agreed to be bound by the ultimate judgment.

[3] Carbon does not own the water rights in question. Carbon owns shares of stock in Price, which it leases to other parties.

As [Reclamation] prepared to carry out the Gooseberry Project, it became aware that the Scofield Dam was deteriorating and becoming dangerous and began to consider reconstructing the Scofield Dam in connection with the Gooseberry Project. In 1943, the Secretary of the Interior recommended that the Scofield Dam reconstruction be given priority over the Gooseberry Project and [Reclamation] entered into the [T]ripartite [Agreement] with [Price and Carbon], conditionally promising to undertake such reconstruction. As part of the consideration for this reconstruction contract, [Price and Carbon] subordinated their water rights in Gooseberry Creek to the right of [Reclamation] to divert water for the Gooseberry Project at such time as the latter project might be completed....[4]

Although [Reclamation] reconstructed the Scofield Dam according to [the Tripartite Agreement], the Gooseberry Project never materialized. In 1975, [Reclamation] assigned to [Sanpete] three pending applications for water rights relating to the proposed project. The purpose of the assignment, as stated in the parties' assignment contract, was to allow [Sanpete] to keep the water applications current and to pursue any litigation which might be necessary in order to preserve the status of such applications. The assignment contract further provided that the applications would revert to [Reclamation] at such time as the Utah State Engineer might grant the requested rights and that [Sanpete] would reassign the applications to [Reclamation] before that time upon request.

*Sanpete County Water Conservancy Dist. v. Price River Water Users Ass'n*, 652 P.2d 1302, 1303 (Utah 1982).

---

[4] The district court referred to these water rights as Application Numbers 1035, 8989a, and 13334. Sanpete explains the significance of the subordination was the establishment of the primacy of the Gooseberry Plan over Price and Carbon's water rights in Scofield Reservoir. The reconstruction increased the capacity of Scofield from 30,000 acre-feet to 73,000 acre-feet.

After Reclamation assigned the three pending applications, Sanpete filed change applications with the Utah State Engineer[5] in order "to obtain permission to change the point of diversion, place of use, and nature of use of the three water rights." Carbon filed protests with the State Engineer objecting to the change applications, and later joined others in filing a lawsuit in federal district court claiming Reclamation's assignment was defective. In the wake of Sanpete's desire to move forward with the Gooseberry Plan, and the pressure from Carbon to reject the change applications, the State Engineer began to broker an agreement between the parties. The parties eventually signed an agreement on June 8, 1984, which is the subject of the current litigation.

> The initial recitals in the agreement state:
>
> WHEREAS, there has been a long standing controversy concerning the building of storage and diversion works on the Price River System for transmountain diversion of Gooseberry Creek water to the San Pitch River System; and
>
> WHEREAS, the parties hereto desire to compromise and settle the controversy and their respective claims to such water.

The agreement then defines the approximate location of the proposed dam as the "Narrows Site" and names the "Narrows Project" as the successor project to the

---

[5] In Utah, the State Engineer controls the administration, allocation, and distribution of water rights.

-5-

old Gooseberry Plan detailed in the Tripartite Agreement. Section II of the agreement lists the water rights owned by Price and Sanpete, and in Section III, Price subordinates its rights to Sanpete's rights in order for Sanpete to divert, store and convey 5,400 acre-feet of water from the Narrows Site to the San Pitch River System. Section IV sets the storage capacity of the Narrows Project, increases Carbon's storage rights in Scofield Reservoir an additional 35,000 acre-feet, and discusses the procedure to be followed in order to satisfy the prior water rights held downstream from Scofield Reservoir.

Finally, we come to the portions of the agreement that are the source of the current conflict. In addition to the sections we have just described, the agreement provides the following: (1) Carbon would voluntarily dismiss the lawsuit challenging Reclamation's assignment of the three applications to Sanpete; (2) Reclamation would withdraw an application seeking additional water from Fish Creek, and the State Engineer would reject a competing application made by Price; (3) the State Engineer would approve Reclamation's application to increase the storage capacity of Scofield Reservoir; (4) Sanpete would withdraw an application seeking to appropriate 15,000 acre-feet of water from Gooseberry Creek; and (5) pursuant to Section V.E., Carbon agreed to refrain from making certain protests: "The parties agree that no protest shall be filed to any of the

foregoing approvals, withdrawals, rejections, dismissals or assignments or to *any further change applications or permits from any state or federal agencies necessary to carry out the purpose and intent of this Agreement*." (Emphasis added.) This section of the agreement does not mention Sanpete's three change applications, the State Engineer's disposition of the applications, or Carbon's filed petitions in opposition to the applications, although the parties did agree the terms and conditions of the agreement could be incorporated as part of the State Engineer's decisions on the change applications.

The parties agree the specific, detailed actions listed in the agreement were carried out. Carbon voluntarily dismissed its lawsuit, telling the judge "the issues have been fully compromised and settled by a written Agreement" between Sanpete and Carbon. The various applications were appropriately withdrawn, approved, or denied. Carbon did not protest any of these actions. In addition, while the agreement did not specifically require him to do so, the State Engineer approved Sanpete's three change applications on January 7, 1985. Again, Carbon did not protest the approvals.

However, as Sanpete moved ahead with its efforts to fund the Narrows Project and obtain the necessary permits to build the dam, Carbon began to

coordinate an effort in opposition to the dam's construction. In a 1991 letter to Carbon from Barnett Intermountain Water Consulting, the consultants outlined possible efforts to "help you further your cause to ultimately prevent the building of the Gooseberry Narrows Project." To this end, Carbon participated in a group that submitted comments to various federal and state agencies opposing the project. This group commented on Reclamation's draft and final Environmental Impact Statements, objected to an application to the Utah Department of Community and Economic Development for a loan to help design the Project, requested Reclamation deny an application for federal funds for the Project, met with political leaders to share its concerns with the Project, submitted comments to the Army Corps of Engineers opposing the § 404 permit needed to move ahead with any project of this nature, ultimately joined with several environmental groups in filing a lawsuit against the Secretary of the Interior and various other federal actors claiming the final Environmental Impact Statement and Record of Decision did not comply with the requirements of the National Environmental Policy Act, and threatened to file a lawsuit alleging the project breached the Endangered Species Act. Suffice it to say Carbon did nothing to help the Narrows Project, and in fact encouraged every federal and state agency along the way to deny Sanpete the permits, approvals, and financing needed to complete the Project.

Sanpete filed the current lawsuit, arguing the aforementioned actions constituted a breach of Section V.E., the "no protest" clause of the agreement, as well as a breach of the implied covenant of good faith and fair dealing inherent in the agreement.[6] The district court disagreed. On cross-motions for partial summary judgment, the district court granted Carbon's motion as to the breach of contract claim, finding the agreement unambiguous and stating the no protest provision "does not prohibit the parties from protesting any applications for permits, it only prohibits the parties from protesting any permits already issued from state and federal agencies." While finding Carbon's activities in opposition to the Narrows Project did not result in a breach of the contract, the district court determined issues of fact remained as to whether the actions breached the implied covenant of good faith and fair dealing. After a week-long trial, and a thorough examination of the intentions of the parties to the contract, the district court found Carbon did not breach the implied covenant of good faith and fair dealing. Sanpete now appeals these two decisions.

---

[6] Sanpete's amended complaint also alleged a breach of Section IV of the agreement. However, Sanpete does not raise this issue on appeal and we do not address it further.

**ANALYSIS**

1. Summary Judgment

We begin with the district court's grant of partial summary judgment finding no breach of the contract. Sanpete argues the district court correctly held the contract was clear and unambiguous, but nevertheless misinterpreted the unambiguous terms of the contract by failing to account for the intent of the parties. Before we dispose of this argument, we must first comment on the inadequate nature of Sanpete's appendix.

Normally, "[w]e review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court under Fed. R. Civ. P. 56(c)." *James Barlow Family Ltd. Partnership v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citation omitted), *cert. denied*, 523 U.S. 1048 (1998). In order to conduct our de novo review, we must necessarily review the materials before the district court. However, Sanpete's appendix does not include: Sanpete's Memorandum of Points and Authorities filed with its Motion for Partial Summary Judgment; Carbon's competing motion and any memorandum it filed in support thereof; an identification of the exhibits, affidavits, and other evidence submitted to the trial court. These omissions amount to a violation of the Federal Rules of Appellate Procedure, as well as our own court rules. *See*

-10-

Fed. R. App. P. 10; Fed. R. App. P. 30; 10th Cir. R. 30.1(A)(1); 10th Cir. R. 10.3(D)(2) (when appeal is from an order disposing of a motion, supporting documents filed with the motion must be included in the appendix). Normally, "[a]n appellant who provides an inadequate record does so at his peril." *Dikeman v. National Educators, Inc.*, 81 F.3d 949, 955 (10th Cir. 1996). However, we exercise our discretion to reach the merits of this claim because Sanpete's two claims are so closely related, and the record we have from trial contains enough evidence to allow us to review the summary judgment decision.

We do not reach our usual de novo review because we are faced with a unique set of circumstances. We do not support the district court's grant of summary judgment and, under normal circumstances, would reverse and remand for trial on the issue of whether Carbon's activities amounted to a breach of the contract. We would reach such a result because we disagree with the district court's ambiguity determination. If a court, after considering "credible evidence offered to show the parties' intention" in entering the contract, determines the various interpretations put forth by the parties "are reasonably supported by the language of the contract," then the contract is ambiguous. *Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264, 268-69 (Utah 1995). Giving Sanpete every reasonable inference, as we must do under our summary judgment standard, we

-11-

find evidence in the record which reasonably supports Sanpete's expansive reading of the contract, and therefore hold the terms of the contract ambiguous.

However, under the circumstances presented here, we conclude any error at the summary judgment stage was subsequently corrected at trial. The record clearly shows the parties spent a good part of the trial presenting evidence on the intent of the parties in entering the agreement and the scope of the "no protest" provision at issue in Sanpete's breach of contract claim. Despite its earlier ruling on summary judgment, the district court reviewed the evidence and specifically made a finding Carbon did not breach the contract. Were we to remand, we would force the trial court to repeat that thorough evidence-gathering and decision-making process, contrary to the doctrine of judicial economy. Given the unique facts of this case, and the relationship between the breach of contract and breach of implied covenant of good faith and fair dealing claims, remand would fulfill no other purpose than further delay of a resolution of this dispute.

We reach this conclusion based on the evidence presented at trial, the district court's findings of facts and conclusions of law, and the nature of the inquiry into a possible breach of the implied covenant of good faith and fair dealing. On this last point, the Utah Supreme Court has held

> [a]n examination of express contract terms alone is insufficient to determine whether there has been a breach of the implied covenant of good faith and fair dealing. To comply with his obligation to perform a contract in good faith, a party's actions must be consistent with the agreed common purpose and the justified expectations of the other party. The purpose, intentions, and expectations of the parties should be determined by considering the contract language and the course of dealings between and conduct of the parties.

*St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 200 (Utah 1991) (citations omitted). This examination bears a remarkable resemblance to the use of extrinsic evidence to determine the meaning of ambiguous contract terms. *See Ward*, 907 P.2d at 268; *Willard Pease Oil & Gas Co. v. Pioneer Oil & Gas Co.*, 899 P.2d 766, 770 (Utah 1995). A review of the record before us buttresses the comparison.

During the trial, the district court heard testimony from individuals involved in negotiating the agreement, viewed early drafts of the agreement, read correspondence and documents, studied the historical evolution of the various water rights in question, and listened to the parties present evidence on the meaning of every sentence in the agreement. In addition, Sanpete presented evidence on the various activities it claimed constituted a breach. Based on this evidence, the district court entered one hundred findings of fact and twenty-one

-13-

conclusions of law.[7]  In holding Carbon did not breach the implied covenant of good faith and fair dealing, the district court found:  (1) the agreement "made it possible for the State Engineer to approve Sanpete's three change applications, and for Sanpete to proceed with attempting to obtain funding for the Project"; (2) "no language in the [agreement] requir[ed] the Carbon district to cooperate with Sanpete in its attempts to obtain funding for the Narrows Project or move the Project forward"; (3) no language in the agreement expressly or impliedly restrict[ed] Carbon's rights to contact federal, state, and local agencies to express concerns about the Project, or to oppose construction of the Project; (4) no language stated the purpose of the agreement was to "resolve all issues that the parties had or may have in the future with respect to the proposed Narrows Project," or to "allow Sanpete to construct and operate the proposed Narrows Project."  Applying these findings, the court concluded "[t]he purpose of the [agreement] was to resolve a water rights dispute," and therefore Carbon's actions opposing the construction of the Project "do not constitute a breach of Section

_____

[7] Sanpete accuses the district court of adopting Carbon's proposed findings of fact, conclusions of law, and order and judgment verbatim.  Sanpete makes nothing but conclusory statements in support of its claim.  However, even if we believed the district court improperly adopted Carbon's proposed findings without reasoned consideration, we would still review the district court's decision under the clearly erroneous standard.  *See Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 886, 892 n.1 (10th Cir. 2000).

V.E. of the [agreement]." Given this specific finding after trial, despite the earlier summary judgment decision, Sanpete cannot argue the district court did not think about and address the breach of contract claim after summary judgment.

In order to prove its breach of contract claim at trial, Sanpete would need to show the existence of a contract, Sanpete's performance and Carbon's nonperformance under the contract terms, and damages. *See Mackey v. Cannon*, 996 P.2d 1081, 1085 (Utah Ct. App. 2000). We cannot imagine a piece of evidence necessary for Sanpete to prove its breach of contract case that was not ultimately presented at trial. Nor does Sanpete direct our attention to any such evidence. In fact, Sanpete relies on the same conduct and the same contract provisions to support both claims. Sanpete describes the district court's error at summary judgment as a failure "to take into account the intent of the parties." If the district court made such a blunder at the summary judgment stage, surely it was more than corrected at trial, where the court examined a myriad of extrinsic evidence, as if it was reviewing an ambiguous contract, studied the intent of the parties, and concluded Carbon did not breach the explicit or implicit purposes of the contract with Sanpete.

As will become apparent in our discussion of the implied covenant of good

faith and fair dealing, the record supports the district court's findings and conclusions.  Therefore, we affirm the grant of partial summary judgment because the district court's opinion issued at the close of trial conclusively dealt with the very evidence and issues that would be presented at a future trial on the issue of whether Carbon's activities amounted to a breach of Section V.E. of the agreement,[8] and the court explicitly found there was no breach.

2.  Implied Covenant of Good Faith and Fair Dealing

Following a bench trial, "[w]e review the district court's findings of fact for clear error and its conclusions of law de novo."  *Valley Improvement Ass'n v. United States Fidelity & Guar. Corp.*, 129 F.3d 1108, 1115 (10th Cir. 1997).  Whether a contract is ambiguous is a question of law.  *See Bank of Oklahoma v. Muscogee (Creek) Nation*, 972 F.2d 1166, 1171 (10th Cir. 1992).  Interpretation of an unambiguous contract is also a question of law.  *See id.*  "However, when the trial court's interpretation is aided by extrinsic evidence," we review the interpretation under the clearly erroneous standard.  *Valley Improvement Ass'n*,

---

[8]  Indeed, given the unity of issues, parties and evidence, one could argue the current case is somewhat analogous to the doctrine of claim preclusion.  *See Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981) ("A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were ... raised in that action.") (quoted in *Rivet v. Regions Bank*, 522 U.S. 470, 476 (1998)).

129 F.3d at 1115.

> A finding of fact is clearly erroneous if it is without factual support in the record or if the appellate court, after reviewing all the evidence, is left with a definite and firm conviction that a mistake has been made. On appeal, we view the evidence in the light most favorable to the district court's ruling and must uphold any district court finding that is permissible in light of the evidence.

*Manning v. United States*, 146 F.3d 808, 812-13 (10th Cir. 1998) (quotation marks and citations omitted). Similar to our rule in diversity cases, we will apply the substantive law of Utah in this state contract action removed to federal court pursuant to 28 U.S.C. § 1442. *See Teague v. Grand River Dam Auth.*, 425 F.2d 130, 131-34 (10th Cir. 1970) (applying state law in wrongful death action removed to federal district court via § 1442); *cf. City of Aurora v. Erwin*, 706 F.2d 295, 296-97 (10th Cir. 1983) (citing *Arizona v. Manypenny*, 451 U.S. 232, 241-42 (1981)) (criminal cases).

The Utah Supreme Court has stated an implied covenant of good faith and fair dealing accompanies every contract. *See Brown v. Moore*, 973 P.2d 950, 954 (Utah 1998). Pursuant to the covenant, "each party impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract." *Id.* at 954 (quoting *St. Benedict's*, 811 P.2d at 199) (quotation marks omitted). As we stated earlier, we must examine the express language of the contract, as well as the course of

dealings between the parties, to determine whether a party has breached the covenant. *Id.* "However, we will not interpret the implied covenant of good faith and fair dealing to make a better contract for the parties than they made for themselves." *Id.* Therefore, this appeal boils down to a fundamental question: What were the benefits, or fruits, of the contract for Sanpete?

The district court viewed the agreement as resolving a water rights dispute, making "it possible for the State Engineer to approve Sanpete's three change applications, and for Sanpete to proceed with attempting to obtain funding for the Project." In addition, the court found one of the benefits flowing to Sanpete was Carbon's agreement "to not file any protests to any future change applications ... [or] any state or federal permits that might be issued in connection with the Project." Sanpete argues the agreement was much broader in scope, designed by the parties to end all the controversies existing at the time between Carbon and Sanpete. In Sanpete's view, any activity by Carbon designed to prevent the building of the Narrows Project amounts to "intentional or purposeful" attempts to "destroy or injure" Sanpete's "right to receive the fruits of the contract." *See St. Benedict's*, 811 P.2d at 199. A necessary predicate to this conclusion is the contention, made by Sanpete in its brief on appeal, the main benefit due Sanpete under the agreement was actual construction of the Narrows Project. We affirm

the district court's rejection of Sanpete's interpretation for several reasons.

First, Sanpete puts too little emphasis on our standard of review. In its reply brief, Sanpete states it "does not dispute that the district court's findings are supported by the evidence. They are. The problem is that the district court ignored, without explanation, every piece of evidence that supported Sanpete's claims." Sanpete reaches this conclusion because the district court did not specifically articulate why it found some evidence more reliable or credible than the evidence put forth by Sanpete. At its core, Sanpete's argument is one best made to a trier of fact. As stated earlier, our task on review is to examine the evidence in the light most favorable to the district court's decision, and we must affirm the district court's findings if at all supported by the factual record.[9] *See Manning*, 146 F.3d at 812. Therefore, Sanpete's concession that the district court's findings are supported by the evidence makes its ultimate argument on appeal less tenable.

_____

[9] Sanpete argues on appeal the testimony of its lawyer and the State Engineer at the time the agreement was signed, stating they thought the agreement resolved all possible controversies between the parties concerning the Narrows Project, proves the intent of the parties was to forever preclude Carbon from protesting the construction of the Project. This argument is unavailing because we must focus on the evidence supportive of the district court's decision and determine if it is sufficient to affirm its decision. We do not reverse simply because some evidence supports an appellant's position.

Second, having conducted our own review, we find factual support in the record for the district court's findings. The disputes leading up to the negotiation of the agreement were centered on water rights, not the actual construction of the dam itself. For instance, the lawsuit Carbon agreed to dismiss challenged Reclamation's assignment of the three water rights applications to Sanpete: "There are actual controversies between the plaintiffs and the defendants as to the authority of a subordinate officer of the United States to dispose of the water rights evidenced by the above-numbered applications, ... without following the procedures set out by specific federal law."

In addition, the language and context of the agreement, when read in its entirety, supports the district court's interpretation. A fundamental tenet of contract interpretation is that provisions cannot be read in isolation. "Each contract provision is to be considered in relation to all of the others, with a view toward giving effect to all and ignoring none." *Plateau Mining Co. v. Utah Div. of State Lands & Forestry*, 802 P.2d 720, 725 (Utah 1990) (quotation marks and citation omitted). The agreement focused on the amount of water each party was entitled to store and use, and the priority of their respective rights. In Section II of the agreement, each party "covenants and represents that it is the owner of the following water applications on file in the office of the Utah State Engineer for

the diversion, storage and use of Price River System water." Section III deals

with subordination of water rights:

> The Price River Water Users Association water rights ... shall be
> subordinated ... to the Sanpete water rights ... to divert and store on a
> first priority basis in each year all water of Gooseberry Creek and its
> tributaries arising above the Narrows Site, ... and to convey by
> transmountain diversion up to 5,400 acre-feet of water from storage
> at the Narrows Site each year for use in the San Pitch River System
> ....

Section IV describes how water will be distributed among the parties should the

Narrows Project move forward, limiting the "active capacity of the reservoir for

the Narrows Project" at no more than 10,000 acre-feet, dictating the 5,400 acre-

feet diversion be measured at the outlet of the transmountain tunnel, increasing

Carbon's storage rights in Scofield Reservoir by 35,000 acre-feet, ensuring

holders of prior water rights downstream from the Narrows Project continue to

have their rights satisfied, and limiting actual releases from Scofield Reservoir for

the benefit of Carbon to the existing 30,000 acre-feet. Section VI requires

Carbon to dismiss its lawsuit, as already discussed, and Section VII discusses the

responsibility of Sanpete to "install and maintain outlet structures and measuring

devices to measure and deliver water in accordance with this Agreement."

Clearly, the agreement, while identifying and referring to the Narrows Project,[10] is

---

[10] Mention of the Project in the agreement is limited to the definitions
section, where the "Narrows Project" is defined as "the project proposed by this
Agreement and contemplates the building of storage and diversion works at or

almost exclusively concerned with the specifics of who gets what water once the Project moves ahead, not with ensuring the construction of the Project.

In addition, the manner in which Section V itself is constructed can also be read to support the district court's conclusion. The section begins with specifics, stating the "United States of America shall withdraw" a certain application, the "State Engineer shall approve" one application and "may reject" another, and "Sanpete shall ... withdraw" one of its applications. All these specific actions relate directly to water rights applications. Section V.E. begins with a reference to these specific actions: "The parties agree that no protest shall be filed to any of the foregoing approvals, withdrawals, rejections, dismissals or assignments," and then ends in the general terms at issue here, "or to any further change applications or permits from any state or federal agencies necessary to carry out the purpose and intent of this Agreement." In such a case, the rule of construction *ejusdem generis* can operate to confine the meaning of the

_____

above the location of the Narrows Site, to store Gooseberry Creek water for transmountain diversion to the San Pitch River System." The "Narrows Site" is also defined in the agreement, and is described as "the approximate location for a proposed dam to be constructed on Gooseberry Creek." This general language is insufficient to show that the parties' purpose and intent in entering the agreement was the construction of the Project when the specific language of the agreement focuses on allocation of water.

subsequent general language to the subject of the more specific language directly preceding. *See Swenson v. Erickson*, 998 P.2d 807, 812 (Utah 2000); Black's Law Dictionary 535 (7th ed. 1999) ("[W]hen a general word or phrase follows a list of specific persons or things, the general word or phrase will be interpreted to include only persons or things of the same type as those listed."). The fact Carbon did not protest the State Engineer's approval of Sanpete's three change applications, despite their absence from the specific enumerated actions in Section V, lends further credence to an interpretation of the "no-protest" provision as narrowly applying to permits related to the water rights dispute.[11]

Just as telling as what was included in the agreement is the evidence

---

[11] We also point out that the nature of Carbon's comments to the various agencies focuses on process. We are not convinced these comments violated the "no-protest" provision as interpreted by Sanpete. For instance, in its comments to Reclamation and the Army Corps of Engineers, Carbon objects to the environmental impact statements and § 404 permit because the agency product did not comply with the National Environmental Policy Act. A distinction can be drawn between commenting on the process required under the National Environmental Policy Act and protesting an actual permit. We have often noted the National Environmental Policy Act does not mandate a particular result, but instead focuses on the process employed to reach it. *See Colorado Envtl. Coalition v. Dombeck*, 185 F.3d 1162, 1172 (10th Cir. 1999); *Environmental Defense Fund, Inc. v. Andrus*, 619 F.2d 1368, 1374 (10th Cir. 1980). Therefore, the selection of a preferred alternative in an environmental impact statement is not the equivalent of actually issuing a permit. One is a prerequisite to the other, but they are not synonymous. Even the lawsuit challenging Reclamation's Record of Decision, which can be characterized as a permit, focused on the technical violations of the National Environmental Policy Act.

presented as to what was left out in the final draft. An earlier draft of the agreement had Carbon acknowledging the agreement was "intended to settle all the rights and claims of the parties relative to the Gooseberry Plan," and agreeing not to protest the then-existing change applications "or challenge the construction and development of the Gooseberry Plan." The draft also included a mutual cooperation clause which would have obligated Carbon to cooperate fully with Sanpete in "obtaining ... the necessary permits and easements to locate and operate the Narrows reservoir facility and diversion works." That these provisions were ultimately excised from the final agreement supports the district court's conclusion the agreement was narrowly-tailored. The final agreement is also void of explicit language stating the intent of the parties was to complete the Narrows Project. Sanpete cannot accomplish indirectly what it failed to accomplish directly in negotiating the agreement.

Finally, Sanpete's argument is flawed for the simple reason the parties to the agreement had no ability to bestow the benefit it claims – construction of the Project. Such a result lies in the hands of a variety of state and federal agencies. The district court determined the agreement only resolved the controversy over the priority and use of the parties' water rights, which allowed Sanpete the "opportunity to move forward with attempting to obtain the funding and permits

-24-

to construct the proposed Narrows Project." As the Utah Supreme Court pointed out nearly twenty years ago, this two-step process of fixing the parties' respective water rights prior to actually seeking the permits to build the Project is necessary because Sanpete's ability to secure the financing for the project is dependent "on resolution of the present uncertainty concerning water priorities." *Sanpete County Water Conservancy Dist.*, 652 P.2d at 1307. We find sufficient support in the record for the district court's determination the agreement resolved that uncertainty, but did not guarantee Sanpete the ability to construct the Narrows Project. Nor did the agreement require Carbon to refrain from opposing agency actions it deemed violative of the provisions of the National Environmental Policy Act, nor give up its rights to participate in the political process in opposition to the project. We are reluctant to so limit a party's rights absent clear, unequivocal language mandating such a result.

The district court determined Sanpete and Carbon, after years of acrimony, entered into an agreement settling their dispute over the priority and use of their respective water rights. As a result of this agreement, Sanpete was finally free to fully pursue its efforts to construct the Narrows Project without facing questions about the volume or validity of its water rights. The district court's findings are not clearly erroneous. Accordingly, we **AFFIRM** the district court for the

reasons stated herein.