2004 UT 28

**Roger K. EGGETT, Jr., Plaintiff and Respondent,**

v.

**WASATCH ENERGY CORPORATION, a Utah Corporation, Defendant and Petitioner.**

**No. 20010786.**

Supreme Court of Utah.

April 16, 2004.

Rehearing Denied June 10, 2004.

Perrin R. Love, Salt Lake City, for plaintiff.

Merrill F. Nelson, Eric C. Olson, Salt Lake City, for defendant.

DURHAM, Chief Justice:

¶ 1 We granted certiorari in this case to review the court of appeals' decision affirming a final judgment awarding plaintiff Roger K. Eggett, Jr. (Eggett) $147,559.96, plus attorney fees. We affirm.

## BACKGROUND

¶ 2 In 1993, Eggett formed Wasatch Energy Corporation (Wasatch) to market and distribute natural gas. Two years later, Eggett and two Wasatch employees entered into a Shareholder Agreement, which set forth the shares allotted to each, with Eggett as the majority shareholder. The Agreement provided that if a shareholder left Wasatch, the remaining shareholders could purchase the departing shareholder's stock. The purchase price would be the book value of the departing shareholder's stock if he left voluntarily and par value if the shareholder was terminated for cause. The Agreement defined par value as the original price the shareholder paid for the stock, and book value as the company's book value multiplied by the departing shareholder's percentage interest. Company book value was to be determined by Wasatch's audited financial statements, which were to be prepared in accordance with generally accepted accounting principles (GAAP).

¶ 3 In 1997, following a series of disputes with Wasatch, Eggett tendered his resignation. At that time Eggett remained the largest shareholder in Wasatch, with an ownership interest of 36.5%. Eggett offered to sell

his stock to the remaining shareholders for book value.

¶ 4 After Eggett tendered his resignation, Wasatch terminated Eggett for cause, and gave him a check for $1,217, the par value of his stock. When Eggett refused the check, Wasatch cancelled his shares on its books.

¶ 5 Eggett brought suit against Wasatch, claiming (1) breach of his Employment Agreement with Wasatch, (2) breach of the Shareholder Agreement, and (3) breach of the covenant of good faith and fair dealing. Eggett sought additional compensation from Wasatch for the period beginning January 1, 1997, through his effective resignation date. He also sought to recover the book value of his stock, alleging that his termination for cause was a "sham."

¶ 6 At trial, Eggett testified that to determine the book value of his shares, "you take the [book value] of the company and you multiply it by my ownership interest, which was 36.5%, so we [first] have to determine the [book value of] the company." Wasatch's audited financial statements indicated a company book value of $75,452, and Wasatch therefore argued that the book value of Eggett's shares was $75,452 multiplied by Eggett's 36.5% ownership interest, or $27,540.

¶ 7 Eggett, however, claimed that Wasatch had manipulated its financial statements in bad faith to reflect a company book value that was artificially low. Eggett claimed that after he left Wasatch, management changed its policy regarding the length of time uncertain receivables would be held in a "suspense" account. The policy, Eggett testified, had always been to hold such receivables in a suspense account for one year and, if they were not the subject of dispute during the one-year holding period, to include them in company book value at the end of that year. Eggett testified that after his departure, Wasatch management changed the holding period to two years in order to avoid including certain receivables in company book value, thereby depressing the value of Eggett's shares. At trial, Eggett was allowed to present evidence that company book value should be adjusted to include (1) a $283,000 reserve for anticipated losses on a "swap contract" which had not occurred, (2)

$296,252 for suspense account items, which would have been included in company book value under the historical one-year holding period, and (3) $45,553 for a disputed purchase contract. Thus, Eggett maintained, company book value should have totaled $699,778. Eggett argued that the book value of his shares (36.5% of $699,778) was therefore $255,419.

¶ 8 Special Verdict Question Number 5 asked the jury the following: "[W]hat was the 'book value' of Wasatch Energy as defined by the Shareholders Agreement?" The jury's written response was "$135,671.96." Upon receiving that response, the trial court questioned the jury and discovered that the verdict actually represented the book value of Eggett's shares, not the total company book value of Wasatch Energy. Accordingly, the court entered judgment for Eggett in the amount of $135,671.61 for the book value of Eggett's shares of stock, $11,888.35 for "additional compensation," and over $60,000 in costs and attorney fees.

## STANDARD OF REVIEW

¶ 9 Wasatch presents three issues for our review: Whether the court of appeals erred in affirming the trial court's (1) decision to admit Eggett's evidence concerning company book value; (2) decision to question and clarify the jury's verdict; and (3) award of attorney fees on the ground that Wasatch failed to marshal the evidence on this question on appeal. We review the court of appeals' decision for correctness, which "turns on whether it accurately reviewed the trial court's decision under the appropriate standard of review." *Clark v. Clark*, 2001 UT 44, ¶ 8, 27 P.3d 538.

¶ 10 The court of appeals applies an abuse of discretion standard of review in determining whether a trial court has properly admitted evidence, *Gorostieta v. Parkinson*, 2000 UT 99, ¶ 14, 17 P.3d 1110, as well as in determining whether a trial court has properly questioned a jury regarding its verdict, *see Jorgensen v. Gonzales*, 14 Utah 2d 330, 383 P.2d 934, 935–36 (1963) (stating the trial court acted "within its prerogative" by "question[ing] the jury foreman about the

possibility of a quotient or chance verdict"); *see also Romano v. U–Haul Int'l,* 233 F.3d 655, 671 (1st Cir.2000) ("The standard of review for a determination of resubmission of special verdict questions is for abuse of discretion."); *Unit Drilling Co. v. Enron Oil & Gas Co.,* 108 F.3d 1186, 1192 (10th Cir.1997) ("[I]t was an abuse of discretion for the trial court to refuse to ask the jury to clarify its verdict."). The court of appeals does not review the trial court's factual findings where the party challenging those findings fails to marshal the evidence. Instead, the court of appeals must "assume that the record supports the findings of the trial court." *Moon v. Moon,* 1999 UT App 12, ¶ 24, 973 P.2d 431 (internal quotations omitted).

## ANALYSIS

### I. ADMISSIBILITY OF EGGETT'S EVIDENCE OF COMPANY BOOK VALUE

¶ 11 According to the Shareholder Agreement, company book value was to be determined by the audited financial statements prepared in accordance with GAAP. The pertinent audited financial statements indicated a company book value of $75,452, and it is undisputed that the book value of Eggett's own shares is 36.5% of whatever is the company book value. Wasatch therefore argues that Eggett is entitled to 36.5% of $75,452, or $27,540. The trial court, however, allowed Eggett's evidence showing a higher company book value. The court of appeals affirmed, holding that such evidence was admissible under Eggett's claim for breach of the covenant of good faith and fair dealing and that the trial court did not abuse its discretion in admitting the evidence. Wasatch argues before this court that the court of appeals erred in applying an abuse of discretion standard of review because the issue was one of contract interpretation, not one of admissibility of evidence.

¶ 12 The court of appeals correctly applied an abuse of discretion standard of review. The issue before that court was whether the trial court properly admitted Eggett's evidence of book value under his claim for breach of the covenant of good faith and fair dealing, not whether the trial court properly interpreted the Shareholder Agreement.

¶ 13 Extrinsic evidence is generally not admissible to vary unambiguous terms in a contract. *See, e.g., Winegar v. Froerer Corp.,* 813 P.2d 104, 108 (Utah 1991) ("A court may only consider extrinsic evidence if, after careful consideration, the contract language is ambiguous or uncertain."). Here, however, Eggett argues he has filed two separate claims—one for breach of the Shareholder Agreement, another for breach of the covenant of good faith and fair dealing—and that his evidence of book value was admissible to prove his breach of covenant claim regardless of whether or not it would be admissible under his claim for breach of the Shareholder Agreement.

¶ 14 An implied covenant of good faith and fair dealing inheres in every contract. *See, e.g., CIG Exploration, Inc. v. State,* 2001 UT 37, ¶ 19, 24 P.3d 966; *Malibu Inv. Co. v. Sparks,* 2000 UT 30, ¶ 19, 996 P.2d 1043. Under the covenant of good faith and fair dealing, both parties to a contract impliedly promise not to intentionally do anything to injure the other party's right to receive the benefits of the contract. *St. Benedict's Dev. Co. v. St. Benedict's Hosp.,* 811 P.2d 194, 199 (Utah 1991). A violation of the covenant is a breach of the contract. *Id.* at 200 (citing *Beck v. Farmers Ins. Exch.,* 701 P.2d 795, 798 (Utah 1985)). Extrinsic evidence may be admissible to prove a claim for breach of the covenant of good faith and fair dealing. For example, in *Olympus Hills Shopping Center, Ltd. v. Smith's Food & Drug Ctrs., Inc.,* 889 P.2d 445 (Utah Ct.App. 1994), the court of appeals held that the trial court had not abused its discretion in admitting extrinsic evidence to prove a claim for breach of the covenant of good faith and fair dealing, even though such evidence was not admissible to vary the terms of the lease contract. *Id.* at 454, 456; *see also Hill v. Hartog,* 658 P.2d 1206, 1208 (Utah 1983) ("Evidence which is [inadmissible] for one purpose cannot be excluded if it is admissible [for] another purpose.").

¶ 15 In the present case, the court of appeals concluded, and we agree, that although Eggett's evidence of book value might be extrinsic and therefore inadmissible to vary the terms of the Shareholder Agreement, it was nevertheless admissible to prove Eggett's breach of covenant claim. Eggett claimed that the breach of covenant occurred in the calculation of book value and that Wasatch breached the covenant by deliberately changing the suspense account holding period from one year to two years, thereby yielding an artificially depressed book value in Wasatch's financial statements for the sole purpose of depriving Eggett of fair compensation for his shares. In order to prove Wasatch acted in bad faith in setting book value too low, Eggett had to present evidence showing that the correct book value was some larger figure. If Eggett had not presented evidence of a higher book value, his breach of covenant claim would have failed. Furthermore, if we were to accept Wasatch's argument that Eggett could not present his own evidence of company book value solely because it differs from the financial statements, parties in Eggett's position would be entirely vulnerable to bad faith calculations. Anytime a contract unambiguously pointed to a separate document for a specific figure, the party with power to create or manipulate that document, even if the manipulation was clearly in bad faith, could act with impunity because the other party's evidence of a different value would always be excluded on the grounds that it varied from the unambiguous contract terms.

¶ 16 We recently noted that "the degree to which a party to a contract may invoke the protections of the covenant turns on the extent to which the contracting parties have defined their expectations and imposed limitations on contract terms." *Smith v. Grand Canyon Expeditions*, 2003 UT 57, ¶ 20, 84 P.3d 1154. We further noted that where the contract terms defined company book value as an amount determined in accordance with GAAP, the covenant of good faith and fair dealing had "little, if any, utility." *Id.* at ¶ 22. Broadly speaking, the more leeway a party has under the terms of the contract, the more contracting parties may invoke the protections of the covenant of good faith and fair dealing in the exercise of that discretion.

¶ 17 Here, the Shareholder Agreement obligated Wasatch to calculate book value in accordance with GAAP. GAAP, however, is not an exact science and allows a range of possible values in its application. Wasatch had the opportunity to employ some discretion in its use of GAAP. There was thus an implied covenant to act in good faith and deal fairly with Eggett in its choices. While Wasatch's compliance with GAAP was a circumstance tending to show Wasatch acted in good faith, such compliance is not conclusive. The jury was entitled to conclude that the voluntary change from a one- to a two-year suspense account holding period, subsequent to Eggett's departure, was a breach of the covenant of good faith and fair dealing, even if such a change did not violate GAAP.

¶ 18 Wasatch next argues that even if Eggett alleged breach of the covenant of good faith and fair dealing, and even if his evidence of book value was admissible to prove that claim, Eggett failed to request recovery in the Special Verdict Form. According to Wasatch, it is "absolutely silent on the subject [of the breach of covenant claim], referring only to the breach of contract claims."

¶ 19 Wasatch misses the critical point: the recovery Eggett sought at trial was the difference between the book value shown by his evidence and the book value set forth in Wasatch's financial statements. In other words, the same evidence that supported the breach of covenant in the first place—evidence of a higher book value—also proved the amount of damages Eggett sought to recover. Moreover, we find no merit to Wasatch's argument that Eggett obtained no recovery at trial for his breach of covenant claim. The jury properly considered and decided in the affirmative the issue of whether Wasatch breached the covenant of good faith and fair dealing, as well as the issue of the amount of resulting damages. Eggett made clear in his opening statement that the recovery sought under his breach of covenant claim was the difference between the book value shown by his evidence and the book value set forth in the financial statements:

"The third claim that Mr. Eggett seeks is breach of the covenant of good faith and fair dealing.... He essentially seeks the same damages for that breach that he seeks ... for book value of his shares."

¶ 20 Furthermore, jury instruction number 27 explained Eggett's breach of covenant claim to the jury:

Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement. Under the covenant of good faith and fair dealing each party impliedly promises that it will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract. A breach of the covenant is a breach of the contract.

Question Number 3 of the Special Verdict Form asked, "Do you find that Wasatch Energy breached its agreements or *obligations* to Roger Eggett, by terminating Roger Eggett for cause and *not paying him book value* for his shares of stock?" (Emphasis added.) The jury checked "yes" in its written response. Contrary to Wasatch's interpretation of question 3, we understand it to ask whether Wasatch breached the covenant of good faith and fair dealing. Specifically, question 3 asks whether Wasatch breached "its agreements or obligations." We read "agreements" as referring to the Shareholder and Employment Agreements, and "obligations" to include the covenant of good faith and fair dealing.

¶ 21 Finally, Wasatch argues that notwithstanding Eggett's breach of covenant claim, and the jury's acceptance thereof, the court of appeals was still required to enforce the Shareholder Agreement's definition of book value as a matter of law. In other words, regardless of anything Eggett might recover under his breach of covenant claim, the book value of Eggett's stock, as a matter of law, must still be limited to 36.5% of $75,452 ($27,540), because $75,452 was unambiguously set forth as the company book value in the financial statements.

¶ 22 There are two fatal flaws in Wasatch's argument. First, Wasatch is not entitled to enforce the Shareholder Agreement. A breach of the covenant of good faith and fair dealing is a breach of the Shareholder Agreement itself. *St. Benedict's*, 811 P.2d at 200 (citing *Beck*, 701 P.2d at 798). Therefore, the jury's finding that Wasatch breached the covenant of good faith and fair dealing means Wasatch breached the Shareholder Agreement itself. As the breaching party, Wasatch has no right to enforcement of the Shareholder Agreement. *See, e.g., Holbrook v. Master Prot. Corp.*, 883 P.2d 295, 301 (Utah Ct.App.1994) ("The law is well settled that a material breach by one party to a contract excuses further performance by the nonbreaching party. Also, a party seeking to enforce a contract must prove performance of its own obligations under the contract." (citation omitted)); *Bell v. Elder*, 782 P.2d 545, 548 (Utah Ct.App.1989). The court of appeals was not required, as a matter of law, to enforce the breached Shareholder Agreement in favor of Wasatch, the breaching party.

¶ 23 Second, even if we assume *arguendo* that Eggett could recover no more than $27,540 under the Shareholder Agreement, this does not help Wasatch. We have previously noted that Eggett's claims for breach of the explicit terms of the Shareholder Agreement and breach of the covenant of good faith and fair dealing were separate claims. *See, e.g., St. Benedict's*, 811 P.2d at 199 (holding trial court erred by failing to consider claim for breach of covenant of good faith and fair dealing as separate from other breach of contract claims). Recovery under one claim is not limited by or tied to recovery under the other claim. The jury found Wasatch "breached its agreements or obligations to ... Eggett" and awarded Eggett $135,671.96 in damages. The jury was not required to apportion the damages award between Eggett's claims for breach of the Shareholder Agreement and breach of covenant. *See Cook Assocs., Inc. v. Warnick*, 664 P.2d 1161, 1164 & n. 3 (Utah 1983) (noting that where the verdict did not identify which theory of liability damages were based on, the verdict should be treated as a general verdict and such verdicts are construed with a view to sustaining them). Wasatch argues that Eggett should recover no more than $27,540 under the Shareholder Agreement.

Even if that were true, there is no reason why the jury could not award the balance of Eggett's damages ($108,131.96) under his breach of covenant claim.

¶ 24 In summary, the court of appeals did not err in applying an abuse of discretion standard of review. The proper issue before it was whether the trial court abused its discretion in admitting Eggett's evidence of company book value under his claim for breach of the covenant of good faith and fair dealing.

## II. THE TRIAL COURT'S CLARIFICATION OF THE JURY'S RESPONSE TO SPECIAL VERDICT QUESTION NUMBER 5

¶ 25 Wasatch next argues that if Eggett's evidence of company book value was properly admitted and the jury actually found breach of the covenant of good faith and fair dealing, Eggett's recovery must be limited to the amount specified in the original verdict. Special Verdict Question Number 5 asked, "[W]hat was the 'book value' of Wasatch Energy as defined by the Shareholders Agreement?" The jury's written response was "$135,671.96." Wasatch argues that since the question asked for Wasatch's book value, the jury found company book value to be $135,671.96 and the book value of Eggett's shares should be 36.5% of the company book value, or $49,520.27. According to Wasatch, the trial court erred by questioning the jury about its verdict and awarding Eggett the entire $135,671.96. Wasatch also argues that the court of appeals erred in affirming the trial court's alteration of the jury verdict under Utah Rule of Civil Procedure 47(s). We disagree.

¶ 26 Utah Rule of Civil Procedure 47(s) states that "[i]f the verdict rendered is *informal* or *insufficient*, it may be corrected by the jury under the advice of the court, or the jury may be sent out again." (Emphasis added). This court has previously stated that " 'insufficient' means inadequate or lacking in some requirement, purpose or use." *Jorgensen v. Gonzales,* 14 Utah 2d 330, 383 P.2d 934, 935 (1963) (citing *Crowe v. Sacks,* 44 Cal.2d 590, 283 P.2d 689, 692 (1955)). "Informal" means "defective · in

form; not in the usual form or manner; contrary to custom or prescribed rule." *Crowe,* 283 P.2d at 692. A verdict in which a jury answers a different question than the one asked is both "informal" and "insufficient." *See, e.g., Langton v. Int'l Transp., Inc.,* 26 Utah 2d 452, 491 P.2d 1211, 1214 (1971) (noting that where the verdict failed to correspond to the instructions given by the court, it was both insufficient and "defective in form"); *see also Crowe,* 283 P.2d at 693 ("A verdict which goes beyond the issues . . . as stated in the [jury] instructions . . . is not in conformity with the instructions and is therefore 'insufficient.' "). This court has stated that "where it is apparent that there is some patent error in connection with the verdict, the court may of course call the matter to [the jury's] attention and direct them to redeliberate." *Jorgensen,* 383 P.2d at 935.

¶ 27 Wasatch argues that rule 47(s) has no application to this case because the verdict contains no patent error. Wasatch directs our attention to Special Verdict Question Number 5 and the jury's response. Question Number 5 asked, "[W]hat was the 'book value' of Wasatch Energy as defined by the Shareholders Agreement?" The jury's written response was "$135,671.96." According to Wasatch, both the question and the answer were clear and unambiguous, and therefore no patent error exists on the face of the verdict. Moreover, the figure the jury returned, $135,671.96, was not patently erroneous on its face because it was between the two figures the parties were claiming as company book value.

¶ 28 We reject Wasatch's argument that there must be patent error on the face of the verdict *before* the trial court has discretion to question the jury about its verdict. This argument finds no support in the literal language of rule 47(s) itself. The rule states simply that "[i]f the verdict rendered is *informal* or *insufficient*, it may be corrected by the jury under the advice of the court, or the jury may be sent out again." Utah. R. Civ. P. 47(s) (emphasis added). Nothing in the language suggests a verdict must be patently erroneous on its face before a trial court has any discretion to ask for clarification. Addi-

tionally, nothing in the language prohibits a trial court, upon discerning some ambiguity or believing the jury answered a question different than the one asked, from questioning the jury to determine what the jury's true verdict is. *See Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1548 (10th Cir.1993) ("[I]t is proper to question jurors to determine exactly what [their] 'true decision' is." (quoting *Eastridge Dev. Co. v. Halpert Assoc., Inc.*, 853 F.2d 772, 783 (10th Cir.1988))). If the questioning reveals that the verdict was, in fact, informal or insufficient, then under rule 47(s) the trial court could properly direct the jury to correct the verdict or send the jury out again.

¶ 29 We also disagree with Wasatch's assertion that the "patent error" spoken of in *Jorgensen* must exist on the face of the verdict. In *Jorgensen* this court said, "[W]here it is apparent that there is some patent error *in connection with* the verdict, the court may of course call the matter to [the jury's] attention and direct them to re-deliberate." 383 P.2d at 935 (emphasis added). *Jorgensen* requires "patent error *in connection with the verdict*," not "patent error *on the face of the verdict*." *Id.* The difference is significant. In some cases, "patent error in connection with the verdict" will only be "apparent" when the verdict is considered in light of the surrounding circumstances, specifically the evidence offered at trial. A trial court has discretion to consider the whole record in determining whether "there is some patent error in connection with the verdict."

¶ 30 Case law from other jurisdictions is congruent on this point. The Tenth Circuit, for example, has indicated that a trial court may look to all the surrounding facts and circumstances to determine whether the jury's verdict is informal or insufficient. *Unit Drilling Co. v. Enron Oil & Gas Co.*, 108 F.3d 1186, 1191 (10th Cir.1997). In *Unit Drilling*, the plaintiff sought recovery of $157,262.36 for breach of contract. *Id.* at 1189. The jury returned one verdict awarding the plaintiff $70,768.02 on its breach of contract claim and another verdict awarding the defendant a set-off of $86,494.30. *Id.* The district court interpreted plaintiff's

$70,768.02 award to be a pre-set-off award, meaning that after the amount of the set-off was deducted, the plaintiff would recover nothing. *Id.* at 1190. The plaintiff, on the other hand, argued that the jury had already deducted the set-off in arriving at $70,768.02. The district court refused to question the jury to clarify the verdict.

¶ 31 On appeal, the Tenth Circuit found that the verdict was ambiguous and held that the trial court abused its discretion in refusing to ask the jury to clarify the meaning of its ambiguous verdict. *Id.* at 1189. The court stated, "[W]e approve[ ][of] the practice of asking the jury to clarify its meaning when the court is faced with an ambiguous verdict.... Whether the jury intended [the plaintiff] to receive a judgment of $70,768.02, or, as the trial court found, nothing, was at the very least ambiguous." *Id.* at 1191. The court also indicated that whether or not a verdict is ambiguous depends on all the circumstances:

> [T]he district court should make a fair appraisal of the *whole record* to discern whether the verdict is, in fact, ambiguous. In this case, potentially misleading jury instructions and forms and the susceptibility of the verdict to an interpretation other than the one arrived at by the district court, given the facts of the case, point to an ambiguity in the verdict. *Only by asking the jury to clarify its verdict could the court have determined the jury's "true decision."*
>
> . . . .
>
> In the present case, the damages awards rendered by the jury were ambiguous and could have been clarified by simply asking the jury a few questions.... We hold that under these circumstances it was an abuse of discretion for the trial court to refuse to ask the jury to clarify its verdict.

*Id.* at 1191–92 (emphasis added) (citing *Resolution Trust*, 998 F.2d at 1548).

¶ 32 In the case before us, it was apparent that there was some patent error in connection with the verdict. The number on the Special Verdict Form suggested to the trial judge that the jury had calculated the book value of Eggett's shares, not the company

book value. It was therefore appropriate for the trial court to clarify the jury's decision.

¶ 33 The problem here was apparent because if the jury had taken the figure for which Wasatch was arguing ($75,452) and added the $296,252 suspense account—but not the other adjustments Eggett sought—company book value would then total $371,704. However, it appeared the jury had multiplied that figure by 36.5% to arrive at $135,671.96, the value of Eggett's shares. Because it appeared to the trial court that this was the case, it "ask[ed] the jury to clarify its verdict ... [to] determine[ ] the jury's true decision." *Unit Drilling*, 108 F.3d at 1191 (internal quotations omitted). Upon reviewing the verdict, the court questioned the jury as follows:

> The Court: Do I understand, Mr. Robertson [jury foreperson], that the jury's decision, as I've read this question number [5], is this the value that the jury believes should be paid for the shares?
>
> Mr. Robertson: We believe that to be the book value.
>
> The Court: And so-
>
> Mr. Robertson: Paid for the *shares*.
>
> . . . .
>
> The Court: ... [L]et me just be sure that I understand what we're talking about. Is this the value that you think [Wasatch] owes to Mr. Eggett to purchase his shares?
>
> Mr. Robertson: Yes.
>
> The Court: All right. Now I'm going to ask that question of all of you as jurors if you concur in that determination. Let me go through.
>
> . . . .
>
> The Court: Okay. I'm going to poll the jury on particularly question number 5. The question, here's the problem and I want to just explain it to the jury so that I get a clear understanding of what your decision is.
>
> We know from the facts of this case that Mr. Eggett owns 36.5[%]. If I interpret your answer to ... question [number 5] to be $135,000.00 for [company] book value[, t]hat would mean that he would be entitled to 36.5[%] of $135,000.00. If I understand it the way I have now asked you the question, he is entitled to $135,671.96 which is a number that you have come to by some calculation method for the purchase of his shares of stock. So, in other words, this figure, [$]135,000, is a representative smaller figure due to him which represents 36 percent of X which is a larger number. All right? Now, I want to be sure that I understand that correctly and if any of you disagree with that, I want to know that.

(Emphasis added.) The trial court then asked each member of the jury whether the verdict meant that $135,671.96 was the book value of Eggett's shares. Each member of the jury responded "yes."

¶ 34 By questioning the jury about its verdict, the trial court was able to verify that the verdict was, in fact, informal and insufficient because the jury had answered the wrong question. At that point, rule 47(s) authorized the trial court to correct the verdict. The trial court "acted not only within its prerogative but properly and discreetly in handling the situation," *Jorgensen*, 383 P.2d at 936, and we therefore hold that the trial court properly clarified Special Verdict Question Number 5 and entered judgment thereon.

### III.   ATTORNEY FEES

¶ 35 Finally, Wasatch argues that the trial court erred in awarding Eggett attorney fees because Eggett's counsel failed to distinguish the recoverable fees sought from those that were nonrecoverable. The court of appeals did not reach that argument, but instead upheld the award of attorney fees on the ground that Wasatch failed to marshal the evidence relied on by the trial court in awarding attorney fees in the first place. We agree with the court of appeals.

¶ 36 "[A]ttorney fees cannot be recovered unless provided for by statute or contract." *Collier v. Heinz*, 827 P.2d 982, 983 (Utah Ct.App.1992) (referring to the rule as the "long-standing rule in Utah"). In the present case, Eggett brought claims under both the Employment Agreement and the Shareholder Agreement. Of the two contracts, only the Shareholder Agreement

provided for recovery of attorney fees. Accordingly, fees pertaining to claims brought under the Shareholder Agreement are recoverable, while fees pertaining to claims brought under the Employment Agreement are not. In order to recover any attorney fees at all, the prevailing party must apportion or separate out the recoverable fees from the nonrecoverable ones. *See Cottonwood Mall Co. v. Sine*, 830 P.2d 266, 269–70 (Utah 1992).

¶ 37 Wasatch argues that Eggett failed to meet the apportionment requirement here and therefore "the attorney fee award must be set aside" as a matter of law. Wasatch argues that the court of appeals erred in basing its rejection of this legal argument on Wasatch's failure to marshal the evidence. "[T]he marshaling requirement applies only to challenges of factual findings, not to conclusions of law." *Peirce v. Peirce*, 2000 UT 7, ¶ 17 n. 4, 994 P.2d 193. Wasatch argues that since it was not challenging the sufficiency of evidence to support the award (a factual challenge), but rather was asserting that no award was permissible without the required apportionment (a legal challenge), the marshaling requirement is inapplicable and the court of appeals erred in applying it to reject Wasatch's legal challenge to the fee award.

¶ 38 The trial court's determination on this question was a factual one. It found that Eggett "made a proper and reasonable segregation between those claims to which he is entitled to an award of . . . fees, and those claims to which he is not entitled to such an award." To challenge that factual finding, Wasatch must "marshal the evidence in support of the [trial court's] findings and then demonstrate that despite this evidence, the trial court's findings are so lacking in support as to be against the clear weight of the evidence, thus making them clearly erroneous." *Young v. Young*, 1999 UT 38, ¶ 15, 979 P.2d 338 (internal quotations omitted); *see also Moon v. Moon*, 1999 UT App 12, ¶ 24, 973 P.2d 431. The court of appeals correctly held that Wasatch failed to marshal the evidence the trial court relied upon in making its factual finding that Eggett properly apportioned recoverable attorney fees.

## CONCLUSION

¶ 39 We affirm the court of appeals. The trial court did not abuse its discretion by admitting Eggett's evidence regarding company book value under his claim for breach of the covenant of good faith and fair dealing, nor did it abuse its discretion by clarifying Special Verdict Question Number 5. Finally, the award of attorney fees was proper.

NEHRING, Justice, concurring:

¶ 40 I concur in the Chief Justice's opinion and write separately in an effort to avoid making more impenetrable the fog which has long enveloped our implied covenant of good faith and fair dealing jurisprudence. I feel a particular duty to express my views on this topic to ensure that this court's opinion in *Smith v. Grand Canyon Expeditions*, 2003 UT 57, 84 P.3d 1154, which I authored, is not misread as an obituary for the implied covenant.

¶ 41 Both *Smith* and this case involve disputes over corporate valuation, and each featured a contract that provided that the valuation was to be conducted in accordance with generally accepted accounting principles (GAAP). In *Smith*, we held that the actions by the parties met the standards established by the contract and thus the implied covenant of good faith and fair dealing had no bearing on the matter. In this case, however, we have concluded that Mr. Eggett is entitled to show that Wasatch breached the implied covenant of good faith and fair dealing.

¶ 42 With these two holdings, this court confronts a direct challenge to our well-founded desire to bring consistency and predictability to the law. As the dissent ably reveals, the Chief Justice's opinion is vulnerable to the charge that it fails to meet that challenge. After all, how could an express contract term setting out a clear valuation methodology fill all of the "gaps" in the understanding or expectations of the parties in *Smith*, but not here? How could compliance with GAAP extinguish the implied covenant in *Smith*, but have endured to yield a sizeable verdict for Mr. Eggett?

¶ 43 A simple, accurate, and incomplete answer is that the implied covenant is by its very nature a pliable doctrine. It is inherently amorphous and evades definitional precision. These traits place the implied covenant directly at odds with predictability of conduct, the most basic and cherished characteristic of the contracts which the implied covenant was created to serve. As one commentator observed, "While the varieties of good faith are not quite as infinite as those of religious faith, it would be quite extraordinary if this protean concept were used in the same sense in all ... assorted instances." Farnsworth, E. Allan, *Good Faith Performance and Commercial Reasonableness Under the Uniform Commercial Code,* 30 U. Chi. L.Rev. 666, 668 (1968).

¶ 44 However, this answer is unsatisfactory to many who share the view made evident in the dissent that the implied covenant can too easily turn away from being an ally of contract law and become its antagonist. This happens when courts mishandle the subtle but important distinction between invoking the implied covenant to compel a contracting party to honor the "agreed common purpose" and "justified expectations" of another party to the contract, *Restatement Second of Contracts* § 205 cmt. a (1979), and injecting it to "establish new, independent rights or duties not agreed upon by the parties" or to "nullify a right granted by a contract to one of the parties." *Brehany v. Nordstrom,* 812 P.2d 49, 55 (Utah 1991).

¶ 45 The parties can reduce the risk that a court will remake their contract and award one party "benefits for which it did not bargain," *see infra* ¶ 51 (quoting *United States ex rel. Norbeck v. Basin Elec. Power Coop.,* 248 F.3d 781, 798 (8th Cir.2001)) by bargaining for terms that limit the exercise of unfettered discretion by one party or that otherwise clearly articulate the purposes and expectations of the parties. In short, the parties to a contract are best served when they fill their own gaps. Still, the use of a gap filler, like GAAP here and in *Smith,* does not *ipso facto* extinguish the implied covenant. Circumstances may exist which cause even carefully drawn limitations on discretionary performance to confound justi-fiable expectations. One such circumstance was present here: a course of dealing between the parties which could reasonably have been interpreted to restrict the acceptable use of GAAP in valuing Wasatch.

¶ 46 We have recognized that the course of dealings between contracting parties may be considered in determining the purpose, intentions, and expectations of the parties. *Brown v. Moore,* 973 P.2d 950, 954 (Utah 1998). Where a history of conduct relating to a contract term that has been interposed as a "gap filler" demonstrates that one party has used the contract provision to frustrate expectations grounded in that historical conduct, the implied covenant of good faith and fair dealing properly offers a remedy. The record here establishes that Wasatch and Mr. Eggett had developed a course of conduct with respect to the manner in which Wasatch booked disputed income received from certain customers. The selected method, a one-year holding period for suspense accounts, complied with GAAP, advanced Wasatch's legitimate business interests, and carried with it implications for the valuation of the company. Wasatch's shift to a two-year holding period defied explanation as a legitimate business decision and was clearly targeted at depressing the company's value and Mr. Eggett's compensation. Such a flaw in a "gap filling" contract term should not be beyond the reach of the law, and the court of appeals and Chief Justice Durham properly ratified the implied covenant of good faith and fair dealing as the appropriate legal tool to remedy the defect.

¶ 47 Justice PARRISH concurs in the concurring opinion of Justice NEHRING.

WILKINS, Justice, concurring in part, dissenting in part:

¶ 48 I concur in section III, and dissent from sections I and II of the majority opinion. I would reverse the court of appeals' affirmance of the trial court's award of $135,671 to Eggett as book value for his shares in Wasatch.

¶ 49 As a matter of law, Eggett's claim for a breach of the implied covenant of good faith and fair dealing cannot be premised on an adjusted measure of the book value of

Wasatch because the parties agreed that the company's book value would be determined with reference to the company's audited financial statements, prepared in accordance with GAAP. The parties further agreed that that value would be "binding and conclusive upon the parties." Because no claim for a breach of the covenant of good faith and fair dealing could be based on Wasatch's choices, so long as those choices satisfied GAAP, the admission of evidence to prove such a claim was error. Given such a resolution, section II's discussion of the trial court's clarification of the jury's verdict is unnecessary.

¶ 50 Recently, in *Smith v. Grand Canyon Expeditions Co.*, 2003 UT 57, ¶ 22, 84 P.3d 1154, we noted that the covenant of good faith and fair dealing is an implied covenant that will not apply "[w]here ... the express contract term defines and limits discretionary performance." Although its application to a buy/sell agreement governed by GAAP was new, this court has previously recognized this principle. In *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991), we observed that the implied covenant of good faith and fair dealing "cannot be construed ... to establish new, independent rights or duties not agreed upon by the parties." Proper application of this rule is demonstrated by the case of *United States ex rel. Norbeck v. Basin Elec. Power Coop.*, 248 F.3d 781 (8th Cir.2001), wherein the Eighth Circuit, applying federal common law, was confronted with the application of the implied covenant of good faith and fair dealing to a contract term *defined in part by GAAP. Id.* at 794–97.

¶ 51 In *Basin Electric*, one dispute between the parties revolved around Basin's amortization of certain costs over a ten-year period instead of the twenty-year period used in other contracts to which it was a party. *Id.* at 794. The amortization over ten years instead of twenty resulted in the other party to the contract paying an additional $3.6 million under the contract. *Id.* at 794–95. The contract mandated no specific amortization provision, but was instead governed by GAAP and Rural Utilities Service System of Accounts rules, neither of which were violated by choosing a shorter amortization period.

*Id.* at 795. The Eighth Circuit reversed a portion of the district court's judgment granted for a breach of the implied covenant of good faith and fair dealing, noting that the covenant "does not imply 'an everflowing cornucopia of wished-for legal duties,'" and "does not impose a general requirement that a party act reasonably[;][r]ather, the covenant acts as a gap filler to deal with circumstances not contemplated by the parties at the time of contracting." *Id.* at 796 (internal citations omitted). The court noted that applying the implied covenant would necessitate rewriting the contract to give one party "benefits for which it did not bargain." *Id.* at 797–98. The majority in this case would do the same for Eggett.

¶ 52 The covenant ought not to be used to assess damages against Wasatch merely because it made certain choices allowed it under the Shareholder Agreement. The Shareholder Agreement defines the scope of Wasatch's responsibility with regard to the book value of the company. The agreement provides that the company's audited financial statement, so long as it comports with GAAP, will be the binding measure of book value. Neither party has argued that Wasatch's audited financial statement was not prepared in accordance with GAAP. Thus, the bargained-for contract defines and limits Wasatch's discretion in determining book value, and Wasatch exercised its discretion within the limits set by the parties. Evidence presented at trial indicates that the holding period for suspense accounts was changed from one to two years to bring Wasatch in line with the industry standard. Other evidence suggested that Eggett advocated the change before his departure. There is, quite simply, no gap to be filled by the implied covenant of good faith and fair dealing. This court ought not to deviate from the parties' clearly expressed intention to allow and require valuation based on GAAP.

¶ 53 Associate Chief Justice DURRANT concurs in the concurring and dissenting opinion of Justice WILKINS.