**In re MIRANT CORPORATION, et al., Debtors.**

**Mirant Americas Energy Marketing, LP, Plaintiff,**

v.

**City of Vernon, Defendant.**

**Bankruptcy No. 03–46590.**
**Adversary No. 03–04440–DML.**

United States Bankruptcy Court,
N.D. Texas,
Fort Worth Division.

Sept. 1, 2004.

Michelle C. Campbell, White & Case, Los Angeles, CA, Paul B. Carberry, White and Case LLP, New York City, Judith Elkin, Mark Joseph Elmore, Stacey C. Jernigan, Frances Anne Smith, Amy M. Walters, Haynes & Boone, Dallas, TX, Vincent R. Fitzpatrick, Jr., J. Robert Forshey, Jeff P. Prostok, Forshey & Prostok, LLP, Fort Worth, TX, Thomas E. Lauria, Bryan A. Merryman, Maria K. Pum, White and Case, LLP, Miami, FL, Ian T. Peck, John David Penn, Robin Eric Phelan, Haynes and Boone, Fort Worth, TX, John H. Sturc, Gibson, Dunn and Crutcher, Washington, DC, for Debtors.

*Memorandum Opinion*

D. MICHAEL LYNN, Bankruptcy Judge.

Before the court is the motion for summary judgment (the "Motion") filed by Mirant Americas Energy Marketing, L.P. ("MAEM") in the above-styled adversary proceeding. MAEM has filed its Plaintiff's Brief in Support of Its Motion for Summary Judgment ("MAEM's Brief"). City of Vernon ("Vernon") filed its response to the Motion and brief in support thereof (the "Response") on July 16, 2004. The court heard argument on August 18, 2004 (the "8/18 Hearing" [1]). The court has before it summary judgment evidence con-

sisting of documents described as required below.

This matter is subject to the court's jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(c)(2). This memorandum opinion constitutes the court's findings and conclusions. FED. R. BANKR. P. 7052.

## I. Background

On September 19, 2000, Southern Company Energy Marketing, LP ("SCEM") and Vernon executed a Transaction Confirmation (MAEM App. 1; Vernon App. 00027) [2] whereby SCEM would supply and Vernon would purchase power for a period beginning on October 1, 2000 and ending on December 31, 2006 (the "Transaction"). The Transaction Confirmation provides that the agreement pursuant to which the Transaction was entered into was the Western Systems Power Pool Agreement (the "WSPP") [3]. In 2001 Southern Company spun-off a group of its subsidiaries including SCEM. Thereafter, SCEM became known as MAEM (MAEM App. 139) [4].

Due to a downgrade in MAEM's debt rating to below investment grade by Moody's and Standard and Poor's [5], Vernon notified MAEM on December 20, 2001 that Vernon was exercising its right under Section 27 [6] of the WSPP to demand ei-

---

1. Vernon filed its Motion for Summary Judgment and Brief in Support Thereof, which it withdrew at the 8/18 Hearing. Vernon stated that it "preserve[s] all of the evidence that was filed with respect to summary judgment as part of" the Response. *See* Transcript of 8/18 Hearing (hereinafter, "Tr.") p. 98.

2. References to MAEM's Appendix of Evidence in Support of Plaintiff's Motion for Summary Judgment and to Vernon's Appendix to Motion for Summary Judgment and Brief in Support Thereof are made herein as "MAEM App." and "Vernon App.", respectively.

3. The Transaction Confirmation refers to the WSPP (to which both Vernon and MAEM are parties) as the "Enabling Agreement" for the Transaction Confirmation.

4. For convenience, the court will hereafter refer to Plaintiff as MAEM regardless of the name in use by Plaintiff at the time of the events described.

5. On December 20, 2001, Standard & Poor's reaffirmed MAEM's investment grade rating (MAEM App. 144; Vernon App. 00124).

6. Section 27 of the WSPP provides, in pertinent part:

ther "the posting of a Letter of Credit; the posting of other acceptable collateral or security; or a Guarantee Agreement executed by a creditworthy entity" (MAEM App. 142–43; Vernon App. 00111–12). On December 24, 2001, MAEM responded to Vernon's demand by explaining why MAEM believed Vernon did "not have reasonable grounds to request assurances" (MAEM App. 144–45; Vernon App. 00124–25). On January 15, 2002, Vernon notified MAEM that its response did not adequately address Vernon's concerns and requested a "mutually agreeable method of satisfying [Vernon's] concerns over the creditworthiness of [MAEM] and an explanation of the successor in operation to Southern Energy, Mirant" (MAEM App. 146–47; Vernon App. 00573–74). On January 25, 2002, Vernon notified MAEM that Vernon was exercising "its right to terminate the September 15, 2000 agreement" effective upon MAEM's receipt of the notification letter (MAEM App. 151; Vernon App. 00129). MAEM on the same date replied that Vernon did not have the right to terminate (MAEM App. 153; Vernon App. 00582). MAEM included with its reply a copy of a certificate from the Secretary of State of Delaware by which SCEM changed its name effective January 19, 2001 (MAEM App. 139; Vernon App. 00585–86). This was followed by an email to Vernon from MAEM on January 29, 2002, which included information regarding the spin-off of MAEM and its affiliates by Southern Company (MAEM App. 155–63; Vernon App. 00779–87).

Vernon refused to accept deliveries of power from MAEM from January 25, 2002 through January 31, 2002 (MAEM's Brief p. 6). On February 1, 2002, MAEM sent notice of termination of the Transaction due to Vernon's failure to provide to MAEM assurances of performance under Section 27 of the WSPP and for Vernon's anticipatory repudiation of the Transaction through Vernon's refusal to receive power from MAEM (MAEM App. 164–66; Vernon App. 00789–91).

## II. Issue

MAEM views the issue the court must decide as whether the WSPP applies to the Transaction. MAEM's position is that if the WSPP applies Vernon is liable to MAEM for the Termination Payment provided for in Section 22.3 of the WSPP, regardless which party is deemed to have terminated the Transaction. The court

---

Should a Party's creditworthiness, financial responsibility, or performance viability become unsatisfactory to the other Party in such other Party's reasonably exercised discretion with regard to any transaction pursuant to this Agreement and any Confirmation Agreement (after the transaction is agreed to or begins), the dissatisfied Party (the "First Party") may require the other Party (the "Second Party") to provide, at the Second Party's option (but subject to the First Party's acceptance based upon reasonably exercised discretion), either (1) the posting of a Letter of Credit, (2) a cash prepayment, (3) the posting of other acceptable collateral or security by the Second Party, (4) a Guarantee Agreement executed by a creditworthy entity; or (5) some other mutually agreeable method of satisfying the First Party. The Second Party's obligations under this Section 27 shall be limited to a reasonable estimate of the damages to the First Party (consistent with Section 21.3 of this Agreement) if the Second Party were to fail to perform its obligations. Events which may trigger the First Party questioning the Second Party's creditworthiness, financial responsibility, or performance viability include, but are not limited to, the following:
. . .
(3) The Second Party or its Guarantor has debt which is rated as investment grade and that debt falls below the investment grade rating by at least one rating agency or is below investment grade and the rating of that debt is downgraded further by at least one rating agency.

agrees that, as a preliminary matter, it must decide whether the WSPP applies to the Transaction. To be complete the court must also decide whether a defaulting party may be entitled to a Termination Payment from a non-defaulting party under the WSPP.

### III. Summary Judgment

Summary judgment is proper when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). *Jenkins v. Chase Home Mortgage Corp.*, 81 F.3d 592, 595 (5th Cir.1996). It is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In the case at bar, there is no dispute regarding the facts. Thus, summary judgment is appropriate.

### IV. Discussion

■ The parties agree that Vernon and MAEM executed a Transaction Confirmation on September 19, 2001 pursuant to the WSPP.[7] At the 8/18 Hearing, the following exchange took place between the court and counsel for Vernon:

> The court: "[D]o you think that the contracts control this, or is there some other authority that I must look to other than the contracts?"

---

7. Vernon has argued that SCEM and not MAEM is a party to Transaction and that the SCEM's transition into MAEM constituted an assignment. The court will not here address that issue, but the court notes that the Federal Energy Regulatory Commission has on multiple occasions commented that SCEM is now MAEM. *See, e.g., AEP Power Marketing, Inc.,* 107 FERC P 61,018, n. 3 (2004) ("At the time

Vernon's counsel: "No. It would be the WSPP."

The court: "So it's within the four corners of the contract?"

Vernon's counsel: "Yes, sir."

Tr. p. 97–98. In the Response, Vernon agreed that it entered into the Transaction pursuant to the WSPP. *See* Response at 2. Therefore, the WSPP applies to the Transaction.

This leaves the court to decide whether a defaulting party may be entitled to a Termination Payment from a non-defaulting party under the WSPP. Vernon argues that MAEM's failure to provide Vernon with assurance of its creditworthiness upon demand by Vernon pursuant to Section 27 of the WSPP constituted an event of default. As the defaulting party, Vernon's argument continues, MAEM is not entitled to a Termination Payment under the WSPP and under Utah law.

The court turns first to whether MAEM is entitled to a Termination Payment under the WSPP. Section 22.2 of the WSPP states, in part:

> Upon termination, the Non–Defaulting Party shall liquidate all transactions as soon as practicable, provided that in no event will the Non–Defaulting Party be allowed to liquidate Service Schedule A transactions. The payment associated with termination ("Termination Payment") shall be calculated in accordance with this Section 22.2 and Section 22.3.

Section 22.3(c) of the WSPP states:

of filing, SCEM (now Mirant Americas Energy Marketing, LP (Mirant)), was affiliated with the Southern Company operating companies...."); *PG & E Gas Transmission, Northwest Corporation,* 99 FERC P 61,222, n. 2 (2002) ("Mirant [Americas Energy Marketing, L.P.] is [sic] formerly known as Southern Company Energy Marketing L.P. (Southern).").

The Non–Defaulting Party shall set off or aggregate, as appropriate, the Gains and Losses (as calculated in Section 22.3(a)) and Costs and notify the Defaulting Party. If the Non–Defaulting Party's aggregate Losses and Costs exceed its aggregate Gains, the Defaulting Party shall, within three (3) Business Days of receipt of such notice, pay the Termination Payment to the Non–Defaulting Party, which amount shall bear interest at the Present Value rate from the time notice of termination was received until paid. *If the Non–Defaulting Party's aggregate Gains exceed its aggregate Losses and Costs, the Non–Defaulting Party, after any set-off as provided in paragraph (d), shall pay the remaining amount to the Defaulting Party within three (3) Business Days of the date notice of termination was received including interest at the Present Value from the time notice of termination was received until the Defaulting Party receives payment.*

(emphasis supplied).

Assuming, *arguendo*, Vernon's argument that MAEM defaulted and Vernon was thus entitled to terminate the Transaction is correct, then MAEM will be entitled to a Termination Payment if a Termination Payment is appropriate based on the calculation under Section 22.3(c). That is, if Vernon's "aggregate Gains exceed its aggregate Losses and Costs," then Vernon, "after any set-off" it is entitled to under Section 22.3(d), "shall pay the remaining amount to" MAEM.

The court recognizes that the apparent effect of Section 22.3(c) is to give to MAEM the profit of its bargain after it had (allegedly) defaulted. While this may seem an odd result, it is plainly the meaning of the words used in the WSPP. As discussed below, the court must give effect to the intent of the parties, and that means enforcing Section 22.3(c) of the WSPP in accordance with its clear terms.

The court's review of the WSPP as amended effective February 1, 2003 [8] strengthens the court's conviction that the parties to the WSPP intended that a defaulting party receive a termination payment in accordance with Section 22.3(c). In the 2003 version of the WSPP, as in subsequent ones, Section 22.2(e)(i) states, in pertinent part:

> *If the Non–Defaulting Party owes the Defaulting Party monies* under this Section 22.3, then notwithstanding the three Business Day payment requirement detailed above, *the Non–Defaulting Party may elect to pay the Defaulting Party* the monies owed under this Section 22.3 over the remaining life of the contract(s) being terminated.

(available at http://www.wspp.org (last visited August 28, 2004) (emphasis supplied)). This revision makes clear that the WSPP contemplates that a non-defaulting party may owe a defaulting party monies upon termination, the amount calculated as provided in Section 22.3, and that in such situation the non-defaulting party must pay the defaulting party.[9]

---

8. WSPP Section 22.3(c) remains unchanged.

9. The court also notes that the Federal Energy Regulatory Commission ("FERC"), the regulating authority of the energy industry, has had the issue before the court brought to its attention, though it took no action. *See Western System Power Pool, Inc.,* 102 FERC P 61,109 (2003) (letter from FERC to Western Systems Power Pool, Inc.). The North-

ern California Power Agency ("NCPA") sought to intervene in a FERC proceeding in which Western Systems Power Pool, Inc. filed with FERC revised rate schedule sheets, which included, *inter alia,* the addition of section 22.2(e), described in part above. NCPA requested that FERC "require [Western Systems Power Pool] to revisit the two-party termination payment provision" of

The court turns next to whether a defaulting party is prohibited from receiving a payment like a WSPP-mandated Termination Payment under Utah law (Utah law governs the WSPP; *see* Section 24). Vernon argues that under Utah law MAEM, as breaching party, is not entitled to enforce the WSPP. The case Vernon cites, *Eggett v. Wasatch Energy Corp.*, is inapposite. 94 P.3d 193 (Utah 2004). In *Eggett*, the Utah Supreme Court addressed breach of the implied covenant of good faith. 94 P.3d at 197. "Under the covenant of good faith and fair dealing, both parties to a contract *impliedly* [as opposed to the express provisions in the agreement in the case at bar] promise not to intentionally do anything to injure the other party's right to receive the benefits of the contract." *Id.* (emphasis supplied). The contract in *Eggett* had no provision for the type of breach the parties in that case were addressing and did not provide for a termination payment to the breaching party.

In the case at bar, however, the breach alleged by Vernon and the consequences resulting from termination are not *implied;* rather they are specifically addressed by the contract itself. That is, failure by MAEM to make assurances of creditworthiness to Vernon, if so required, amounts to an event of default according to the terms of the WSPP. *See* WSPP Section 27.[10] Under Section 22 of the

WSPP, following a default the non-defaulting party may terminate the transaction. *See* WSPP Section 22.2.[11]

█ Utah law is clear—if the terms of a contract are not ambiguous, the contract must be enforced according to the terms of the contract itself. *See Winegar v. Froerer Corp.*, 813 P.2d 104, 108 (Utah 1991) ("In interpreting a contract, the intentions of the parties are controlling. If the contract is in writing and the language is not ambiguous, the intention of the parties must be determined from the words of the agreement.") (citations omitted); *Atlas Corp. v. Clovis Nat'l Bank*, 737 P.2d 225, 229 (Utah 1987) ("The cardinal rule in construing any contract must be to give effect to the intentions of the parties."). These general rules of construction are applicable not only in Utah but are regularly applied in the courts of this circuit. *See, e.g., In re El Paso Refinery, L.P.*, 171 F.3d 249, 257 (5th Cir.1999) ("Our primary concern is to give effect to the true intentions of the parties as expressed in the written agreement. Absent ambiguity, the writing alone will be deemed to express the intention of the parties, and objective intent rather than subjective intent controls.") (citations omitted). As discussed above, the WSPP is "in writing and the language is not ambiguous."

---

WSPP section 22 "which provides for a two-way termination payment with both the defaulting and non-defaulting parties paying damages whenever a contract is terminated." Though FERC allowed the NCPA's intervention, FERC denied NCPA's request because that "proceeding [was] not the appropriate forum [sic] to address NCPA's concerns...."

10. WSPP Section 27 states, in pertinent part:
    If the Second Party fails to provide such reasonably satisfactory assurances of its ability to perform a transaction hereunder within three (3) Business Days of demand therefore, that will be considered an Event

of Default under Section 22 of this Agreement and the First Party shall have the right to exercise any of the remedies provided for under that Section 22.

11. WSPP Section 22 states, in pertinent part:

    If an Event of Default occurs, the Non–Defaulting Party shall possess the right to terminate all transactions between the Parties under this Agreement upon written notice (by facsimile or other reasonable means) to the Defaulting Party, such notice of termination to be effective immediately upon receipt.

The court agrees with Vernon that it is peculiar for a non-defaulting party to owe a termination payment to a defaulting party. However, it is clear from the WSPP that the parties to the WSPP intended that a non-defaulting party must make payment to a defaulting party upon termination of a transaction by the non-defaulting party should the situation so dictate. The parties agree that MAEM is "in-the-money" and Vernon is "out-of-the-money." Vernon is thus liable for damages to MAEM pursuant to the WSPP.

Finally, the court has not addressed how termination occurred (or even *if* it occurred). With respect to that issue and resolution of other issues, such as mitigation and market prices, which must occur before the court can determine the amount for which Vernon is liable, the evidence before the court is insufficient and could reasonably lead the court to more than one amount. Therefore, summary judgment must be denied as to the amount Vernon owes.

## V.  Conclusion

For the foregoing reasons, the Motion is GRANTED as to Vernon's liability and DENIED in all other respects. Counsel for MAEM shall prepare and submit to the court a judgment consistent with this *memorandum opinion*, which shall also provide that each party shall bear its respective costs.